**Affirmed and Memorandum Opinion filed February 20, 2020.**



In The

# Fourteenth Court of Appeals

### NO. 14-19-00755-CV

### IN THE INTEREST OF J.Z.S.

**On Appeal from the 313th District Court
Harris County, Texas
Trial Court Cause No. 2018-04196J**

### MEMORANDUM OPINION

Appellant T.Z.M. ("Mother") appeals the trial court's final order of termination of her parental rights to her child J.Z.S. ("John").[1] The trial court terminated Mother's parental rights on the predicate grounds of endangerment, execution of an irrevocable affidavit of voluntary relinquishment of parental rights, and failure to comply with the service plan for reunification. *See* Tex. Fam. Code

---

[1] We use pseudonyms or initials to refer to the child, parents, and other family members involved in this case. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

Ann. § 161.001(b)(1)(E), (K), and (O). The trial court also determined that termination of Mother's parental rights was in John's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2). Mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding on the predicate ground of endangerment and the best interest finding. We affirm.

## BACKGROUND

The Department of Family and Protective Services (the "Department") filed an Original Petition for Protection of a Child on August 22, 2018 and sought sole managing conservatorship and the termination of Mother's and Father's parental rights with respect to John (who was about one year old at the time). The Department attached the affidavit of Annabel Gonzalez (a Department investigator) to its original petition.

The affidavit reflects that the Department received a report of neglectful supervision on August 14, 2018, which stated that John was riding in a car with his Father when the police stopped the car based on a suspicion the car was stolen.[2] Father was arrested at the time because he had "outstanding warrants." The affidavit reflects that Mother was in jail on a criminal trespass charge at the time of Father's arrest and was released from jail two days later. At the time, Mother was six months pregnant with Father's second child, and Mother admitted "she might test positive for marijuana."

Gonzalez averred in the affidavit that she conducted an investigation and concluded that Mother and Father were "unwilling[ ] to cooperate with the ongoing investigation" and unable "to provide a safe and stable environment." She also said Father appeared "to be under the influence at the time of interview," and that

---

[2] Auto theft charges were never filed against Father.

2

Mother's admission "to smoking marijuana places the child at imminent risk of harm."

The trial court granted the Department's request and placed John in the Department's temporary conservatorship on August 22, 2018. That same day, Mother was ordered to submit to drug testing but refused. John was initially placed with relatives, but he was then moved to a foster home.

The trial court held an adversarial hearing on September 5, 2018, at which Mother did not appear. After the hearing, the court signed a temporary order and found that (1) there was a continuing danger to John's health and safety; and (2) despite the Department's "reasonable efforts to eliminate the need for [John]'s removal," allowing John to be in his parents' care was contrary to his welfare. In the order, the trial court (1) appointed the Department to be John's temporary managing conservator pending a final hearing; and (2) ordered Mother and Father to "comply with each requirement set out in the Department's original, or any amended, service plan during the pendency of this suit." Mother signed the family service plan on September 19, 2018.

The trial court held a status hearing on October 17, 2018, at which Mother appeared through her attorney. The court signed an order (1) finding, among other things, that the Department's service plan was reasonable and that Mother and Father reviewed and understood the plan; and (2) approving and incorporating the plan into the "order of this Court."

The trial court held a permanency hearing on January 30, 2019, at which Mother appeared in person and through her attorney. The court signed an order following the hearing, which reflected the court (1) reviewed the service plan, permanency progress reports, and other submitted information concerning John's safety and well-being; (2) evaluated Mother's and Father's compliance with

3

temporary orders and the service plan; (3) found Mother and Father failed to demonstrate adequate and appropriate compliance with the service plan; (4) found that neither parent is "willing and able" to provide John with a safe environment; and (5) ordered that Mother's visits with John be bi-weekly and supervised at the Department's office. On the day of the permanency hearing, Mother submitted to drug testing; the results showed she tested positive for amphetamine, methamphetamine, and cocaine.

Another permanency hearing was held on May 8, 2019, at which Mother appeared through her attorney. The trial court signed an almost identical order to the one it signed at the previous permanency hearing, except that it stated "visitation for Mother shall increase if her 5-8-19 drug test is negative." Mother refused to provide a urine sample for testing, but she provided a hair sample. Results showed she tested positive for methamphetamine.

The Department filed a permanency report with the court in July 2019, in which it provided details about John as well as Mother's progress regarding the requirements of her family service plan. Among other things, the report states:

- John was placed with his maternal aunt in February 2019, but the "placement broke down" in April 2019 and John had to be returned to the Department because Mother and Father harassed the aunt;

- Mother failed to avoid criminal activity, was arrested on October 12, 2018, and was "out on bond for Burglary of Habitation;"

- Mother completed her psychosocial evaluation on January 22, 2019;

- Mother failed to complete her psychological evaluation;

- Mother attended substance abuse therapy sessions;

4

- Mother tested positive for amphetamine and methamphetamine on January 4, 2019;

- Mother tested positive for cocaine, amphetamine, methamphetamine, and benzoylecgonine on January 28, 2019;

- Mother tested positive for cocaine and methamphetamine on January 30, 2019;

- Mother was required to test for drugs but did not test on February 7, 2019, February 13, 2019, and March 14, 2019;

- Mother tested negative for drugs on March 26, 2019;

- Mother was required to test for drugs but did not test on April 17, 2019;

- Mother tested positive for methamphetamine on May 8 and 15, 2019;

- Mother was required to test for drugs but did not test on May 21, 2019, and June 10, 2019; and

- Mother failed to maintain stable housing and employment.

The trial court held a bench trial on August 22, 2019. The Department's caseworker Angelia Debose testified at trial. She stated that John lived in foster care and the placement met his emotional and physical needs. John had no special needs and the Department's goal was for John to be adopted by Mother's brother, who had no criminal or Child Protective Services (CPS) history. A home study was ordered so that Mother's brother could adopt John and Mother's new baby, who was the subject of a show cause hearing in Montgomery County.

Debose testified that when the Department first received a report of neglectful supervision, Mother was in jail and John was initially placed with his

great-grandmother. She also testified that the Department had to remove John from the great-grandmother's home because Mother and Father tried to "get the child" and "cause[d] confusion in the family." The court thereafter granted the Department temporary managing conservatorship at the September 5, 2018 adversary hearing and then approved a family service plan for Mother. Debose also testified about the tasks Mother was required to accomplish under the service plan (including (1) avoiding criminal activity, (2) completing a psychosocial and psychological evaluation, (3) following the recommendations from those assessments, (4) completing a substance abuse assessment, (5) submitting to random drug screening, (6) completing parenting classes, and (7) maintaining stable housing and stable employment).

Debose further testified that Mother failed to comply with several of the provisions under the plan. Although Mother completed the psychosocial assessment, she failed to complete the psychological evaluation. The paperwork for Mother's psychological evaluation expired because Mother was arrested in October 2018 for allegedly criminally trespassing. After Mother was released from jail, Debose again sent paperwork to the facility but "they could not get ahold of mom." Debose also gave Mother the phone number of the facility three months before trial, but Mother failed to complete the evaluation.

Debose also testified that Mother participated in some family and individual therapy sessions but failed to complete individual substance abuse therapy sessions and was discharged for lack of attendance. When Debose tried to get Mother to attend another facility for therapy, Mother told Debose "she was not able to go because she was working." Debose acknowledged that Mother "recently" sent her a document "relating to enrollment" in an inpatient drug treatment program, but Debose testified she was not "aware of" whether Mother was "attempting now to

6

get herself enrolled in an inpatient treatment."

Debose further stated that Mother was arrested for allegedly criminally trespassing in October 2018 and in August 2019, despite being required to avoid criminal activity under her plan. Debose testified that Mother claimed the October criminal trespass charges against her would be dropped but her case "kept resetting." According to Debose, Mother also failed to maintain stable employment and housing. The last information she received from Mother regarding her housing was "a snapshot of a motel on 45 that she was staying in temporarily until her apartment [became] ready", which Mother claimed would be in July 2019.

Further, Debose testified that Mother had not maintained a drug-free lifestyle as required by her plan and failed to submit to drug testing since May 15, 2019 (when she tested positive for methamphetamines). Debose testified that over the course of this case, Mother failed to submit to ten court-ordered drug tests and that the Department treats "a no show for a court ordered drug test" as a positive drug test. However, Debose acknowledged that Mother told her she could not "make it" to drug testing "because of transportation or work issues."

The court admitted several exhibits[3] into evidence which confirmed that with the exception of a negative March 26, 2019 test, Mother tested positive for (at least) methamphetamine every time she submitted to testing. Debose testified that "Methamphetamines is a real hard drug to get off of. And mom needs to understand that she needs to be drug free in order to take care of a two year old

---

[3] The trial court admitted National Screening Center records, Debose's permanency report, and Traci Jensen's child advocate report. These exhibits contained evidence of when (1) Mother failed to submit to drug testing and (2) Mother tested positive and the drugs for which she tested positive.

7

child. They constantly need attention."

Regarding Mother's supervised visits with John, Debose stated that Mother and John appeared to be bonded and the visits "were going fine" until June when Mother started "showing up to the visits with her daughter unsupervised." Debose was also concerned about Mother's last visit in July because Mother called the police stating John "was being medically neglected and it looked as if the caregivers were not feeding him." According to Debose, "Mom was stating that the child came into care on a breathing machine", but "the doctor's notes show that [John] didn't come into care with breathing problems or asthma."

Debose testified that while she did not observe a "lack of ability to parent" during the supervised visits with John, she believed that "continuous criminal activity and multiple arrests would demonstrate an inability to parent the child safely." Debose opined that John's "parents have a lifestyle that is not appropriate for raising young children." Debose further opined that Mother has not benefitted from therapy sessions because, "[e]ven when she was actively engaging in the therapy sessions, . . . she has not shown that she can stay drug free." According to Debose, the Department believed Mother's failure "to remain drug free and [engagement] in a drug lifestyle" endangered the physical health and safety of John.

Child advocate Traci Jensen also testified at trial. She briefly summarized the content of her report and echoed concerns similar to those expressed by Debose. Jensen was concerned about the lack of information Mother provided to her regarding housing and employment. She was also concerned about Mother's drug use and positive test results. Jensen acknowledged Mother and John "appeared bonded" and their interaction during visits was "appropriate." Nonetheless, she opined that parental rights to John should be terminated because

8

of the "contact with the police, and drug history, and [sic] continued throughout the duration of this case."

During Jensen's testimony, Mother's attorney asked for a brief recess during which Mother and Father each executed an irrevocable affidavit of voluntary relinquishment of parental rights to the Department; Mother's attorney then asked the trial court to accept the irrevocable affidavits. The Department stated that, although it was not opposed to parental termination based on the affidavits, it would still pursue termination based on grounds of endangerment and failure to comply with the service plan for reunification.

Mother's testimony at trial revealed her understanding that by signing the affidavit, she freely and voluntarily gave up all of her rights to John. Mother testified she gave up her rights because she believed "it's the best thing to do today." Mother asked the court to accept her affidavit and the court admitted it into evidence. Mother also asked the court to terminate her parental rights solely based on her execution of the irrevocable affidavit.

Mother testified she was 22 years old at the time of trial, that she had given birth to John and one other child, and that she had failed to complete her family service plan. She further acknowledged having a drug problem and battling drugs for "about a year and a half." Mother claimed she recently enrolled in a drug treatment program but admitted previously relapsing when she attempted drug treatment. Mother admitted she had used methamphetamines for "about a year" and last used the drug in July 2019 (one month before the trial).

When asked whether she agreed that the lifestyle she and Father had lived was not conducive to raising a small child, Mother responded: "It's not conducive to raising a small child, but it is to raising children eventually, I mean. Hey, I'm asking you guys for help. We came as a family now to ask you guys for help so . .

9

. . It's possible." Mother disagreed that returning John to her "as of today" would be unsafe.

Father also testified that (1) he voluntarily signed the irrevocable affidavit of relinquishment, (2) he did not "participate in this case", and (3) he "did not participate in any of the services offered" to him (even though he "had chances" to participate). Father testified that he and Mother had been in a relationship for over three years and the two were also parents to a baby girl who "as of today is subject to another CPS case in Montgomery County." Evidence of Father's numerous convictions was admitted at trial, including a conviction for endangering a child, two DWI convictions, several convictions for possession and delivery of a controlled substance, and two criminal trespass convictions. Further, evidence was introduced that Father was "currently also facing a felony for burglary of a habitation."

Father testified he did not think Mother "even knew about [methamphetamines] until she met" him. Although he denied introducing Mother to the drugs, he acknowledged he was friends with people who used drugs and Mother "became familiar with drugs in the course of her relationship with" him. Father stated: "I feel like this is my fault, my responsibility." Father also "agree[d] that methamphetamines is [sic] a controlled substance and a very dangerous drug."

The trial court signed a Decree for Termination on September 3, 2019 that terminated Mother's and Father's parental rights to John on the predicate grounds of (1) endangerment, (2) execution of an irrevocable affidavit of voluntary relinquishment of parental rights, and (3) failure to comply with the service plan. The trial court also determined that termination of Mother's and Father's parental rights was in John's best interest. Mother filed a timely appeal.

10

## I.      Standard of Review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Although parental rights are of constitutional magnitude, they are not absolute. *In re A.C.*, 560 S.W.3d 624, 629 (Tex. 2018); *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

Because of the severity and permanency of terminating the parental relationship, Texas law requires clear and convincing evidence to support a termination order. *See* Tex. Fam. Code Ann. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265-66 (Tex. 2002). "Clear and convincing evidence" is defined as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam). This heightened evidentiary burden at trial results in a heightened standard of review on appeal in parental termination cases. *See N.G.*, 577 S.W.3d at 235.

In a proceeding to terminate the parent-child relationship brought under section 161.001 of the Texas Family Code, the petitioner must establish, by clear and convincing evidence, one or more acts or omissions enumerated under section 161.001(b)(1) and that termination is in the best interest of the child under subsection (b)(2). Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

In reviewing legal sufficiency of the evidence in a parental termination case, we must consider all evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009).

In reviewing the factual sufficiency of the evidence under the clear and convincing burden, we consider and weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *A.C.*, 560 S.W.3d at 631. "'If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient.'" *J.O.A.*, 283 S.W.3d at 345 (quoting *J.F.C.*, 96 S.W.3d at 266).

## II.    Endangerment Finding

Although the trial court terminated Mother's parental rights on three separate grounds, in her first issue Mother only challenges the legal and factual sufficiency of the evidence to support the trial court's endangerment finding under section 161.001(b)(1)(E).

Only one predicate finding under section 161.001(b)(1) of the Family Code is necessary to support a judgment of termination when there also is a finding that termination is in the child's best interest. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). However, due process requires that when a parent has raised the issue of insufficiency of the evidence to support the trial court's findings under section 161.001(b)(1)(D) or (E) of the Family Code, an appellate court must address one of those endangerment findings to ensure a meaningful appeal. *N.G.*, 577 S.W.3d at 235; *In re P.W.*, 579 S.W.3d 713, 720 (Tex. App.—Houston [14th Dist.] 2019, no

12

pet.).  Due process and due-course-of-law requirements also mandate that an appellate court detail its analysis for an appeal of termination of parental rights under section 161.001(b)(1)(D) or (E) of the Family Code.  *P.W.*, 579 S.W.3d at 720.  Because Mother challenges the trial court's finding of endangerment under section 161.001(b)(1)(E), we address the trial court's endangerment finding.

The trial court may terminate parental rights under section 161.001(b)(1)(E) if it finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child."  Tex. Fam. Code Ann. § 161.001(b)(1)(E).  The relevant inquiry is whether evidence exists that the endangerment of the child's physical and emotional well-being was the direct result of the parent's conduct, including acts, omissions, or failure to act.  *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

Children are endangered when their environment creates a potential for danger of which the parent is aware but disregards.  *S.M.L.*, 171 S.W.3d at 477. Termination under subsection (E) must be based on more than a single act or omission — the evidence must demonstrate a voluntary, deliberate, and conscious course of conduct by the parent.  *In re C.A.B.*, 289 S.W.3d 874, 883 (Tex. App.— Houston [14th Dist.] 2009, no pet.).

Although endangerment under subsection (E) often involves physical endangerment, the statute does not require that the conduct be directed at a child or that the child actually suffer physical injury; rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone.  *See Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) ("'endanger' means to expose to loss or injury; to jeopardize").  Incarceration of a parent alone will not support termination, but evidence of past and continuing criminal conduct,

convictions, and imprisonment may support a finding of endangerment under subsection (E). *See C.A.B.*, 289 S.W.3d at 886.

Further, a factfinder reasonably can infer that a parent's failure to submit to court-ordered drug tests indicates the parent was avoiding testing because she was using illegal drugs. *In re V.A.*, 14-19-00590-CV, 2020 WL 355382, at *10 (Tex. App.—Houston [14th Dist.] Jan. 17, 2020, no pet. h.); *In re E.R.W.*, 528 S.W.3d 251, 265 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Moreover, indicia of endangerment include an inability to maintain adequate or stable housing and adequate or stable employment. *In re T.S.*, No. 07-12-0283-CV, 2012 WL 4464302, at *1 (Tex. App.—Amarillo Sept. 27, 2012, no pet.) (mem. op.); *see also In re T.G.R.-M.*, 404 S.W.3d 7, 15-16 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *In re R.M.*, No. 14-02-00221-CV, 2003 WL 253291, at *4 (Tex. App.—Houston [14th Dist.] Feb. 6, 2003, no pet.) (mem. op.).

Here, the evidence is undisputed that Mother failed to maintain a drug-free lifestyle throughout the proceedings. Mother tested positive for methamphetamines every time she submitted to drug testing (except for one negative drug test); she also tested positive for cocaine on two occasions. Mother admitted to both having a drug problem and unsuccessfully battling her drug problem for about a year and a half. She admitted taking methamphetamines just weeks before trial. Mother also admitted her lifestyle is "not conducive to raising a small child," but denied that John would be unsafe with her.

Debose testified that methamphetamine is "a real hard drug to get off of," and opined that "being addicted to methamphetamines demonstrates an inability to parent a child safely." Debose also testified that Mother has not benefitted from therapy sessions because, "[e]ven when she was actively engaging in the therapy sessions, . . . she has not shown that she can stay drug free." Debose stated that

Mother "needs to understand that she needs to be drug free in order to take care of a two year old child. They constantly need attention."

Evidence further showed that Mother was convicted of possession of marijuana in 2016 and convicted of criminal trespass in May 2018. Mother failed to avoid criminal activity as required by her family service plan because evidence showed she was arrested for allegedly criminally trespassing in October 2018 and shortly before trial in August 2019.

Moreover, Mother failed to maintain stable housing and employment. She also continued to be in a relationship with Father, even though evidence showed that (1) Father used drugs; (2) Mother "became familiar with drugs" while in a relationship with Father; (3) Father had friends who used drugs in Mother's and Father's company; and (4) Father had numerous drug-related convictions as well as two DWI convictions, two criminal trespass convictions, a conviction for endangering a child, and was "facing a felony for burglary of a habitation" at the time of trial.

Mother asserts the evidence does not support the trial court's endangerment finding. In that regard, Mother claims that "[a]ll drug tests were completed well after [John] was removed" from her so that "no evidence links the drug use to any time that [she] was parenting" John. Although she admits that "continued illegal drug use after a child's removal is conduct jeopardizing parental rights and may constitute endangering conduct," she nonetheless asserts that a "parent who relapses during recovery in a case where there is no link to drug use and any prior endangering conduct cannot be assumed to be committing endangering conduct."

Mother also argues that her limited criminal conduct and incarceration weigh against a finding of endangerment. To support her contention, Mother cites *In re F.M.E.A.F.*, 572 S.W.3d 716 (Tex. App.—Houston [14th Dist.] 2019, pet.

15

denied), and argues that this court reversed the termination of parental rights when "the mother's trespass, theft and resisting arrest convictions were not the type from which it can be inferred that the mother endangered the child." However, Mother oversimplifies and dilutes our findings in *F.M.E.A.F.*

There, we reviewed the trial court's best interest finding and not a predicate finding of endangerment under subsection (E). *Id.* at 731-34. Further, we explained that, among several best interest factors weighing against parental termination, there was a strong desire of the 16-year-old child to stay with her mother.[4] *Id.* at 732. And although we noted that the mother's "theft, trespass, and resisting arrest convictions are not the type from which it can be inferred that she has endangered the [child]'s physical safety," we emphasized that "unlike most decisions upholding termination based on repeated criminal conduct," there was no evidence the mother had a substance abuse problem. *Id.* at 733.

In contrast, the evidence in this case establishes, among other things, that Mother (1) was convicted of possession of marijuana in 2016 (in addition to being convicted of criminal trespass in 2018); (2) admitted having "a drug problem" and battling drugs for "about a year and a half"; (3) tested positive to at least methamphetamines throughout this proceeding (except for one negative drug test); and (4) continued to associate with Father who used drugs and had numerous drug-related convictions.

Under the applicable standards of review, we conclude the evidence is legally and factually sufficient to support the trial court's finding that Mother

---

[4] Additionally, the Department stated that the child ran track for school, made As and Bs, and planned to go to college, evidencing a lack of endangerment in general despite the other factors present therein. *F.M.E.A.F.*, 572 S.W.3d at 730.

endangered John as described in subsection (E). *See V.A.*, 2020 WL 355382, at *10; *In re R.E.T.R.*, No. 14-13-00640-CV, 2013 WL 6506689, at *4-6 (Tex. App.—Houston [14th Dist.] Dec. 10, 2013, no pet.) (mem. op.); *In re T.G.R.-M.*, 404 S.W.3d at 15-16; *R.M.*, 2003 WL 253291, at *4. Accordingly, we overrule Mother's first issue.

## III. Best Interest

In her second issue, Mother contends the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the best interest of John.

The best interest analysis typically focuses on the child rather than the parent, and the factfinder may consider the following non-exclusive factors (known as the *Holley*[5] factors) to determine the best interest of a child: (1) the desires of the child; (2) the physical and emotional needs of the child now and in the future; (3) the physical and emotional danger to the child now and in the future; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *In re J.J.L.*, 578 S.W.3d 601, 610 (Tex. App.—Houston [14th Dist.] 2019, no pet.).

However, the Texas Supreme Court has held that a statutorily compliant affidavit of voluntary relinquishment is ordinarily sufficient and provides ample evidence to support a best interest finding under the clear and convincing evidence

---

[5] *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

standard. *A.C.*, 560 S.W.3d at 633-34; *In re K.S.L.*, 538 S.W.3d 107, 111-12 (Tex. 2017). The supreme court has also held that although a compliant affidavit of relinquishment is "[n]ot necessarily conclusive on the [best interest] matter," it is "certainly ample to clear the elevated evidentiary threshold." *See A.C.*, 560 S.W.3d at 634. The court explained:

> [E]ven under a clear-and-convincing standard, we think in the ordinary case a sworn, voluntary, and knowing relinquishment of parental rights, where the parent expressly attests that termination is in the child's best interest, would satisfy a requirement that the trial court's best-interest finding be supported under this higher standard of proof. . . . A parent's willingness to voluntarily give up her child, and to swear affirmatively that this is in her child's best interest, is sufficient, absent unusual or extenuating circumstances, to produce a firm belief or conviction that the child's best interest is served by termination.

*Id.* (quoting *K.S.L.*, 538 S.W.3d at 112).

Here, Mother executed a sworn, irrevocable affidavit of voluntary relinquishment of parental rights. She testified that she understood "what's contained in the document" and that the affidavit is irrevocable. She testified that she voluntarily and freely gave up her parental rights to John, she agreed it was in John's best interest to do so, and she did not oppose admission of the affidavit into evidence. She also never sought to withdraw the affidavit.

Mother makes no argument on appeal that this case presents "unusual or extenuating circumstances" nor does the record before us support such an argument. Thus, we conclude the statutorily compliant affidavit constitutes clear and convincing evidence that termination of Mother's parental rights was in the child's best interest. *See A.C.*, 560 S.W.3d at 633-34; *K.S.L.*, 538 S.W.3d at 111-12; *In re D.L.A.*, No. 04-18-00182-CV, 2018 WL 4412506, at *8 (Tex. App.—San Antonio Sept. 18, 2018, pet. denied); *see also In re A.G.C.*, 279 S.W.3d 441, 452-

53 (Tex. App.—Houston [14th Dist.] 2009, no pet.).  Accordingly, we overrule Mother's second issue.

## CONCLUSION

We affirm the trial court's Decree for Termination.


/s/    Meagan Hassan
Justice


Panel consists of Justices Zimmerer, Spain, and Hassan.