

NUMBER 13-19-00591-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF I. M. V., A CHILD

On appeal from the 267th District Court
of Victoria County, Texas.

# MEMORANDUM OPINION

### Before Chief Justice Contreras and Justices Longoria and Perkes
### Memorandum Opinion by Justice Longoria

Appellant M.M.C. (Mother) challenges the termination of her parental rights to her child I.M.V.[1] *See* TEX. FAM. CODE ANN. §§ 161.001(b)(1)(D), (E), (O). The trial court found that the termination of Mother's rights was in I.M.V.'s best interest. *See id.* § 161.001(b)(2). In her sole issue, Mother argues that the trial court had insufficient medical evidence to support the termination. We affirm.

---

[1] To protect the identity of minor child, we utilize aliases for the child and related parties. *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

## I. BACKGROUND

I.M.V. was born with her meconium testing positive for marijuana and methamphetamine and appellee, the Department of Family and Protective Services (the Department), immediately became involved. Approximately eleven months later, on October 15, 2019, the trial court presided over the termination hearing at which the Department sought to have Mother's rights to I.M.V. terminated.

I.V. (Father)[2] testified at the hearing that he witnessed Mother doing drugs, specifically methamphetamine, during the course of her pregnancy with I.M.V. At the time of the termination hearing, Father was incarcerated for assault family violence, for an altercation with Mother. Father further testified that he provided the Department with family options for I.M.V., including Father's grandmother, whom he believed would be the best person to raise I.M.V. He believed that Mother could be fit to raise I.M.V. if she were to move out of her mother's house and stop using drugs, but he testified that "[Mother has] had 11 months to get it together" and he believes that termination would be appropriate.

Nikki Carver, a caseworker for the Department assigned to I.M.V.'s case, testified that she assisted the original caseworker, Katy Sanders, who is no longer employed with the Department, in creating a service plan for Mother due to I.M.V.'s meconium testing positive for methamphetamine and marijuana at birth, though her urine analysis tested clean. The Department attempted to initiate a safety plan which would provide for twenty-four-hour supervision for Mother and I.M.V. The Department looked at "10 to 15" options for the safety plan, but only one caregiver was viable. After only one weekend where

_____

[2] I.V. voluntarily relinquished his rights to the child and is not a party to this appeal.

Mother and I.M.V. stayed at the caregiver's home, the caregiver was unable to continue to provide care. According to Carver, the Department was unable to create a new safety plan which would have involved the child's paternal great-grandmother caring for I.M.V., because the paternal great-grandmother was unsure that Father was actually I.M.V.'s father and wanted testing to be done before she would be considered a caregiver. As such, the Department sought removal of I.M.V. from Mother due to Mother's "extensive drug use" and refusal to attend inpatient counseling.

Carver described her brief interactions with Mother as "like a roller coaster," stating that "[Mother] was all over the place" and Mother's emotions changed very quickly, which was concerning to Carver. Carver testified that Mother did not possess the parenting skills necessary to care for I.M.V. Carver also believed that I.M.V. was in immediate danger due to the instability of the home and the rampant drug use in the home. The Department, in doing its check into the home, discovered that there was also a drive-by shooting outside of the home involving Father. The Department removed I.M.V. and she was then placed in foster care.

Dr. Russell Thompson, a licensed psychologist contracted by the Department, testified that he was asked to perform a psychological evaluation of Mother. After months of scheduling and rescheduling appointments, he was able to briefly meet with Mother. He had reviewed the records in the case prior to their meeting. At first, Mother refused to sign the consent form for his evaluation, and subsequently, after she signed and he began the evaluation, she attempted to retrieve the signed form from his briefcase. Thompson testified that Mother was contentious and upset, and because of her behavior and demeanor, he felt that he could not proceed with the evaluation. He found that Mother

3

was not cooperative and would not benefit from therapy because in his limited time with her, Mother did not give him the impression that "she would be willing to be reflective or introspective to consider ways that she might change or work on things to help solve" her problems.

Diana Stafford, a teacher of parenting skills for the Reclamation Center, testified that Mother was signed up for the ten-week parenting course. Initially, Mother signed up for the course on December 18, 2018, and she participated in nine of the ten weeks. In order to complete the course, Mother needed to attend all ten weeks. Mother did not complete the make-up class offered for week ten. Later, Mother returned to re-do the course, but only completed weeks five and six. Mother never completed the full ten-week course.

Jill O'Neill, a counselor, was referred to Mother's case by the Department. She testified that she did not have a consistent individual counseling relationship with Mother, but that she offered her support services to Mother and would attend the visits between Mother and I.M.V. She testified that Mother was at times argumentative, oppositional, and not committed to counseling. O'Neill testified that she observed that Mother was not engaged "in the overall development—medically, emotionally—of the needs of the child." O'Neill testified that Mother did appear to become more engaged and developed more of a rapport with I.M.V. in the months before the termination hearing.

Rosie Valderrama, the Department caseworker assigned to monitor the visits between Mother and I.M.V., also testified. She explained that there were thirty-seven scheduled visits, but Mother canceled or missed thirteen of those. Valderrama explained that there were several instances, seven recorded, where Mother refused to return I.M.V.

to Valderrama's care without Valderrama receiving assistance from other caseworkers after the visit. Like O'Neill, Valderrama expressed that mother was resistant to any parenting suggestions and advice during her visits. She noted that Mother had shown signs of improvement with I.M.V., but that in a recent visit in July of 2019, Mother showed signs of anger and aggression toward I.M.V. for not drinking her bottle fast enough and Valderrama stated that Mother told the child "she wasn't going to be spoiled at home." Valderrama stated that Mother's discipline of I.M.V. was not age appropriate.

I.M.V.'s occupational therapist, Beverly Seals, testified that she has been working with I.M.V. since December 26, 2018. Seals noted that I.M.V. has many special needs, especially with feeding due to her cleft palate. Seals had one visit with Mother and I.M.V. in which Seals attempted to show Mother calming techniques for I.M.V.; Mother was resistant, though she ultimately accepted the help because she was told she had no choice. Seals visited with I.M.V. weekly and she stated that I.M.V. is improving and she has "really come a long, long way with this [foster] family."

The Department attempted to call Renae Stevens, a nurse case manager at Citizens Medical Center, but Mother objected, arguing that Stevens was not disclosed as a witness. The trial court sustained Mother's objection to the witness but allowed the Department to present her testimony as a bill of exception. The Department sought to introduce medical records, with an attached business records affidavit signed by the custodian of records at Citizens Medical Center. The Department moved to admit the medical records and Mother objected because the witness was not listed on the disclosure. The court admitted the records as a "Court's exhibit."

5

Mother testified that she has never used methamphetamines, but that she has smoked marijuana. She explained that she was not aware that she was pregnant when she was smoking marijuana. The Department presented Mother with the discharge papers from Citizens Medical Center which showed that I.M.V.'s meconium tested positive for amphetamines, methamphetamines, and marijuana. Mother responded that I.M.V.'s urinalysis and blood test were clean. She did not attend rehabilitation or counseling for her drug use, and continued to deny having ever used methamphetamines, though she tested positive for the drug on January 18, 2019. Mother admitted that she had failed a drug test. She also admitted that there was a test in which the lab determined that her urine was not the correct temperature and could not be tested, leading to a belief that she was attempting to use a false specimen. The lab would let Mother retake the test if she would agree to be monitored, which she refused. Mother then proceeded to skip all other scheduled and court ordered drug tests in April, May, June, July, August, September, and October of 2019.

Mother admitted that she did not see a doctor for any prenatal care while pregnant with I.M.V., but stated that she was "keeping up with [her] prenatal care at home" by signing up for daily emails on "What to Expect" and "Before the Baby Comes." She went to the hospital one time during her pregnancy, after a car accident, but could not recall when exactly that was. Mother stated that she did not seek prenatal care because Father was abusive and when she attempted to go once, he took her and was impatient at the appointment, so they left. She attended domestic violence awareness classes and stated that she learned a lot from those group classes. Her reasoning for not attending many of the other counseling sessions and evaluations was that the caseworkers, psychologists,

6

and team set for her by the Department were not a proper fit for her, and she did not get along with most of them.

Mother understood that there were multiple options for the trial court to consider, including termination and conservatorship possibilities. Her hope was that I.M.V. could be placed with Mother's family while Mother continued to work on her progress toward being a fit parent. Mother acknowledged that the foster parents were taking good care of I.M.V. and she was appreciative of their care.

Marlinda Oviedo, a caseworker with the Department, testified that she created a family plan of service for Mother, which Mother signed after it was "discussed in detail." According to Oviedo, Mother argued that her signature on the service plan was "forced." At a home visit with Mother, Oviedo went over the family plan again, explaining the significance of completing the plan in order for reunification with I.M.V. to be a possibility. Oviedo testified that Mother refused, skipped, or canceled approximately thirty drug tests. Mother did one hair follicle test in January 2019, which tested positive for methamphetamines and amphetamines, and Mother presented her own drug test results, which were negative. Oviedo felt that Mother endangered the physical and emotional well-being of I.M.V. specifically because I.M.V. was born drug positive and Mother refused all suggestions and services to help reunify her with I.M.V. Oviedo testified that Mother failed to comply with the provisions of the court ordered family plan. Oviedo believes that termination of Mother's parental rights is in the best interest of I.M.V. with a long-term goal of adoption by a relative, if it proved to be in I.M.V.'s best interest and would achieve permanency for the child.

The trial court terminated Mother's rights to I.M.V. *See* TEX. FAM. CODE ANN. §§ 161.001(b)(1)(D), (E), (O). This appeal followed.

## II.     INSUFFICIENT EVIDENCE

In her sole issue on appeal, Mother contends that the evidence was insufficient to terminate her rights because "no medical evidence was admitted to support" the termination. Mother argues that her objection to the medical records was sustained and that the trial court only accepted the records as a "Court exhibit" and as such, the Department did not prove by clear and convincing evidence that Mother's parental rights should be terminated.

## A.     Standard of Review

"Termination of parental rights, the total and irrevocable dissolution of the parent-child relationship, constitutes the 'death penalty' of civil cases." *In re K.M.L.*, 443 S.W.3d 101, 121 (Tex. 2014) (Lehrmann, J., concurring). Accordingly, termination proceedings must be strictly scrutinized. *In re K.M.L.*, 443 S.W.3d at 112; *see In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018); *see also In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) ("[T]he rights of natural parents are not absolute; protection of the child is paramount . . . . The rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994))).

To terminate parental rights, the movant must prove by clear and convincing evidence that (1) the parent committed one or more statutory predicate acts or omissions, and (2) termination is in the child's best interest. *See* TEX. FAM. CODE ANN. §§ 101.007, 161.001(b); *see also In re N.G.*, 577 S.W.3d 230, 234 (Tex. 2019) (per curiam). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the

mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007. "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *In re A.C.*, 560 S.W.3d at 630.

Evidence is legally sufficient if a reasonable fact finder could form a firm belief or conviction that the finding was true. *Id.* (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We view all the evidence in the light most favorable to the finding; we must also consider undisputed evidence, if any, that does not support the finding. *In re K.M.L.*, 443 S.W.3d at 113; *see In re J.F.C.*, 96 S.W.3d at 266 ("Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.").

In conducting a factual sufficiency review, we consider whether the disputed evidence is such that a reasonable finder of fact could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. Evidence is factually sufficient if "the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the [Department]'s allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002).

## B.    Termination Under §§ 161.001(b)(1)(D) and (E)

In this case, the trial court found evidence of three predicate grounds to terminate Mother's parental rights. *See* TEX. FAM. CODE ANN. §§ 161.001(b)(1)(D), (E), (O). The trial court also found termination of Mother's parental rights was in the child's best interest. *See id.* § 161.001(b)(2). Mother does not dispute the trial court's best interest finding and

9

she does not specifically address the statutory grounds for which termination was ordered.

The trial court found that Mother "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child" . . . and "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child. . . ." *See id.* § 161.001(b)(1)(D), (E). While both paragraphs (D) and (E) focus on endangerment, they differ regarding the source and proof of endangerment. Paragraph (D) concerns the child's living environment, rather than the conduct of the parent, though parental conduct is certainly relevant to the child's environment. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under paragraph (E), the cause of the endangerment must be the parent's conduct and must be the result of a conscious course of conduct rather than a single act or omission. *Id.*

The statutory ground for termination found in paragraph (D) allows for termination of parental rights if the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(D). The child's "environment" encompasses the suitability of the child's living conditions and the conduct of parents or others in the home. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). "[A] parent need not know for certain that the child is in an endangering environment; awareness of such a potential is sufficient." *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Paragraph (D) permits termination

based upon only a single act or omission. *In re R.D.*, 955 S.W.2d 364, 367 (Tex. App.—San Antonio 1997, pet. denied).

Under paragraph (D), the trial court examines "evidence related to the environment of the [child] to determine if the environment was the source of endangerment to the [child]'s physical or emotional well-being," although parental conduct can be a factor that contributes to this environment. *In re J.T.G.*, 121 S.W.3d at 125. The relevant period for review of conduct and environment supporting termination under paragraph (D) is before the Department removes the child. *In re J.R.*, 171 S.W.3d 558, 569 (Tex. App.—Houston [14th Dist.] 2005, no pet.). However, "a fact-finder may infer from past conduct endangering the well-being of a child that similar conduct will recur if the child is returned to the parent." *In re D.J.H.*, 381 S.W.3d 606, 613 (Tex. App.—San Antonio 2012, no pet.).

Paragraph (E) permits termination if the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Under paragraph (E), endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Instead, endanger means to expose the child to loss or injury or to jeopardize his emotional or physical well-being. *Id*. The trial court must determine "whether evidence exists that the endangerment of the child's physical well-being was the direct result of [the parent's] conduct, including acts, omissions, or failures to act." *In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet. denied); *In re S.M.L.*, 171 S.W.3d at 477. "It is not necessary that the parent's conduct be directed at the child or that the child actually be injured; rather, a child

11

is endangered when the environment or the parent's course of conduct creates a potential for danger which the parent is aware of but disregards." *In re S.M.L.*, 171 S.W.3d at 477. A fact finder is also not limited to consideration of the parent's actions before the child has been removed by the Department; any actions or inactions occurring before and after a child was born may be considered, including evidence of a parent's drug use or proclivity for violence. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009).

Evidence of the children's environment before the Department obtained custody, including the acceptability of the children's living conditions and parental conduct in the home, is subsumed in the (D) and (E) endangerment analysis. *See In re J.E.M.M.*, 532 S.W.3d 874, 880–81 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Likewise, "[i]nappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in the home is a part of the 'conditions or surroundings' of the child's home" under subsection (D) and (E). *In re M.D.M.*, 579 S.W.3d 744, 764 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (quoting *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)); *see also In re E.M.*, 494 S.W.3d at 222 ("Abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child.").

Mother solely argues that the "gravest and most damning claim" against her was that I.M.V.'s meconium tested positive for marijuana and methamphetamine. She contends, that because this information was not properly admitted through medical records, there was no evidence against her that would amount to clear and convincing evidence that her parental rights should be terminated. The Department counters that

even assuming, arguendo, that the medical records were not admitted, there was unobjected-to testimony regarding the positive drug test result for I.M.V.'s meconium. The Department further argues that even without the evidence of I.M.V.'s drug positive birth, the evidence supports findings under paragraphs (D) and (E) because Mother: "(1) used drugs during her pregnancy; (2) tested positive for methamphetamine at the beginning of the case; (3) refused thirty-two drug tests; (4) refused to participate in her court-ordered services; and (5) engaged in criminal conduct."

### 1. Meconium Drug Test

Mother argues that the medical records containing the results from I.M.V.'s meconium drug test were inadmissible and that her objection to the admission of those records was sustained by the trial court. While the trial court accepted the records as a "court exhibit," there was no later discussion as to admissibility as the trial court indicated there would be.

Assuming but not deciding that the records were inadmissible and the objection was sustained, we note that numerous witnesses testified as to their knowledge of the positive drug results. Mother argues that the witness testimony is hearsay and "[s]aid hearsay, whether objected to or not, cannot amount to the mass of evidence needed to reach clear and convincing evidence that parental rights should be terminated."

We disagree. There was ample testimony from the witnesses that they viewed the drug test results and were involved in the case specifically based upon those results. Carver testified:

> Q. So at the time that you were working with Ms. Sanders, what did you observe in regards to her investigation?

A.  I assisted with [Sanders] on getting a service plan in place for [Mother] and her baby.

Q.  Why were you assisting getting a service plan for [Mother] and her baby, [I.M.V.]?

A.  Because the baby tested positive for methamphetamines and marijuana on a meconium test.

Thompson also testified regarding the results from the meconium drug test:

Q.  And as part of your services with the Department are there things that you usually use to review prior to your meeting with the individual?

A.  Yes. I'm given any, usually I'm given court documents or documents from the family-based services program. If there have been treatment recommendations or other reports from investigators, the information varies from case to case.

Q.  And in [Mother's] case were you given various documents?

A.  Yes.

Q.  What exactly were you given?

A.  I was given a, I believe, it was a treatment summary form that had information about the onset of the case and the events leading up to the investigation and the information that the investigator had reported about [Mother].

Q.  And you reviewed those documents prior to meeting [Mother]; is that correct?

A.  Yes, yes.

. . .

Q.  How did that conversation go between you and [Mother]?

A.  . . . So then I started talking about the things that I understood led up to this case—that she had tested positive for marijuana at the birth of her child and the meconium had tested positive for amphetamines and other drugs.

Mother's counsel did not object to this testimony.

14

Even if the testimony was hearsay, we would consider it in our sufficiency analysis because Mother did not object to it. *See* TEX. R. EVID. 802 ("Inadmissible hearsay admitted without objection may not be denied probative value merely because it is hearsay."); *see also In re A.G.*, No. 13-17-00318-CV, 2017 WL 4546984, at *6 (Tex. App.—Corpus Christi–Edinburg Oct. 12, 2017, no pet.) (mem. op). Accordingly, even if the records were not properly admitted, the Department presented evidence through multiple witnesses that I.M.V.'s meconium tested positive for methamphetamines and marijuana. *See In re M.T.R.*, 579 S.W.3d 548, 570 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) ("When evidence identical or similar to the objected-to evidence is admitted elsewhere without objection, there is no harm.").

### 2. Additional Evidence

Although Mother does not challenge the trial court's findings specifically as they relate to § 161.001(b)(1)(D), (E), and (O), we note that evidence of violent conduct in the home between parents is also evidence of an environment that endangers the physical or emotional well-being of a child. *See In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Evidence of narcotics use and its effect on a parent's life and her ability to parent may also establish that the parent has engaged in an "endangering course of conduct." *See In re B.M.S.*, 581 S.W.3d 911, 917 (Tex. App.—El Paso 2019, no pet.); *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Under paragraph (O) of family code subsection 161.001(b)(1), parental rights may be terminated upon a finding that the parent

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not

15

less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child[.]

TEX. FAM. CODE ANN. § 161.001(b)(1)(O). Paragraph (O) does not provide a means of evaluating partial or substantial compliance with a plan, and it does not "make a provision for excuses" for the parent's failure to comply with the service plan. *In re D.N.*, 405 S.W.3d 863, 877 (Tex. App.–Amarillo 2013, no pet.); *In re J.S.*, 291 S.W.3d 60, 67 (Tex. App.–Eastland 2009, no pet.). Therefore, "substantial compliance is not enough to avoid a termination finding" under this statute. *In re C.M.C.*, 273 S.W.3d 862, 875 (Tex. App.–Houston [14th Dist.] 2008, no pet.).

The Department provided evidence of Father's abuse of Mother; Mother's drug use before and after removal of I.M.V.; Mother's refusal to appear for over thirty drug tests, including those that were court ordered; and Mother's failure to complete her family services plan.

After a review of all of the evidence, we conclude that a rational finder of fact could have formed a firm belief or conviction that Mother knowingly placed I.M.V. or knowingly allowed I.M.V. to remain in conditions or surroundings which endangered the child's physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). Moreover, to the extent the facts were disputed, the trial court could have reasonably resolved those disputes in favor of the challenged finding. *See In re J.J.L.*, 578 S.W.3d 601, 609 (Tex. App.—Houston [14th Dist.] 2019, no pet.) ("We may not second-guess the fact finder's resolution of actual dispute by relying on disputed evidence or evidence the fact finder 'could easily have rejected as not credible.'" (quoting *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003))). Lastly, the trial court could have reasonably determined that Mother failed to comply with the provisions of her family service plan to obtain the return

16

of I.M.V. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(O). Accordingly, we conclude that the evidence was legally and factually sufficient to support termination under subsections (D), (E), and (O). *See id.* § 161.001(b)(1)(D), (E), (O).

We overrule Mother's sole issue.

### III. Conclusion

The judgment of the trial court is affirmed.


NORA L. LONGORIA
Justice

Delivered and filed the
19th day of March, 2020.