**Affirmed and Memorandum Opinion filed October 12, 2023.**



In The

# Fourteenth Court of Appeals

## NO. 14-23-00377-CV

## IN THE INTEREST OF K.M.H., A CHILD

**On Appeal from the 310th District Court
Harris County, Texas
Trial Court Cause No. 2019-46295**

## MEMORANDUM OPINION

In this appeal from a judgment terminating the parent-child relationship, the Father argues that the evidence is insufficient to support the trial court's various predicate findings, as well as the trial court's other finding that termination is in the Child's best interest. Because we conclude that the evidence is sufficient to support at least one predicate finding and the best-interest finding, we overrule the Father's arguments and affirm the trial court's judgment.

## BACKGROUND

The Child, a girl, was born with a congenital heart defect. Surgical operations were performed at an early age, including a heart transplant at the age of four. Following the transplant, the Child was required to receive a complicated regimen of antirejection medication, which the Mother neglected to administer. Because of that neglect, the Child was readmitted to the hospital less than three months after the transplant.

During that hospitalization, the Department received two separate referrals. The first was for medical neglect, which stemmed from the Mother's failure to administer the Child's antirejection medication. And the second was for suspected sexual abuse, which stemmed from the Child's display of sexual behavior and her use of vulgar language.

The Department investigated the allegations, but the Department ultimately allowed the Child to be discharged from the hospital and returned to the Mother. Upon the Child's discharge, the Mother neglected to administer the Child's antirejection medication for a second time, and the Child was readmitted to the hospital again.

During that latter hospitalization, the Child told her medical team that the Mother's boyfriend had touched her in an inappropriate sexual manner. This time, the Department removed the Child from the Mother's care and petitioned to terminate the Mother's parental rights. After a delay in identifying the Father, who had been incarcerated since the Child was nearly two months old, the Department also petitioned to terminate the Father's parental rights.

The Mother voluntarily relinquished her parental rights, but the Father contested the termination in a lengthy trial that spanned more than one year. At its

conclusion, the trial court signed a decree of termination finding that the Department had proven predicate grounds (D), (E), (O), and (Q), and that termination of the Father's parental rights was in the Child's best interest. *See* Tex. Fam. Code § 161.001(b)(1)(D) (endangerment by environment); Tex. Fam. Code § 161.001(b)(1)(E) (endangerment by conduct); Tex. Fam. Code § 161.001(b)(1)(O) (failure to comply with family service plan); Tex. Fam. Code § 161.001(b)(1)(Q) (criminal conduct that resulted in imprisonment).

The Father now appeals from that judgment.

## THE PREDICATE FINDING

To terminate the parent-child relationship, the trial court must make two findings. *See In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). First, the trial court must find that a predicate ground for termination has been satisfied, which typically requires proof by clear and convincing evidence that a parent has either committed a prohibited act or has failed to perform a required act. *See* Tex. Fam. Code § 161.001(b)(1). If the trial court finds such a predicate ground for termination, the trial court must then find by clear and convincing evidence that termination is in the child's best interest. *See* Tex. Fam. Code § 161.001(b)(2).

The trial court here found four predicate grounds for termination: grounds (D), (E), (O), and (Q). And on appeal, the Father argues that the evidence is legally and factually insufficient to support each of these predicate findings.

We must affirm the trial court's judgment if, in addition to upholding a challenged best-interest finding, the evidence is sufficient to support just a single predicate ground for termination. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) ("Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that a termination is in the

child's best interest."). But when there are appellate challenges to predicate grounds (D) and (E), as there are here, we must consider whether the evidence is sufficient to support either of those findings first. *See In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam) (explaining that due process requires a consideration of predicate grounds (D) and (E) because those grounds can have significant collateral consequences for parents in future termination proceedings involving different children).

We begin with the Father's appellate challenge to the trial court's finding under predicate ground (E).

To support a finding under predicate ground (E), the Department had the burden of showing that the Father has "engaged in conduct . . . which endangers the physical or emotional well-being of the child." *See* Tex. Fam. Code § 161.001(b)(1)(E). The Department was also required to carry this burden by clear and convincing evidence, which is greater than the simple preponderance standard that applies more commonly in civil cases. *See* Tex. Fam. Code § 161.001(b)(2). Under the standard for clear and convincing evidence, the measure or degree of proof must produce in the mind of the trier of fact a firm belief or conviction that the allegation sought to be established is true. *See* Tex. Fam. Code § 101.007. This heightened burden of proof results in a "correspondingly searching standard of appellate review." *See In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).

When reviewing the legal sufficiency of the evidence in a parental termination case, we consider all of the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that its finding was true. *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could have done so, and we disregard all evidence that a

reasonable factfinder could have disbelieved. *Id.* This standard does not mean that we disregard all evidence that does not support the finding. *Id.* When deciding whether the finding is supported by clear and convincing evidence, we must also consider undisputed evidence contrary to the finding. *Id.*

In a factual-sufficiency review, we give due consideration to both the disputed evidence contrary to the finding as well as all of the evidence favoring the finding. *Id.* The evidence is factually insufficient if, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction. *Id.*

The Department's evidence of endangerment focused on the Father's history of incarceration. Standing alone, a parent's mere incarceration will not satisfy the predicate ground for endangerment, but if the evidence as a whole—including the incarceration—shows a course of conduct that has the effect of endangering the physical or emotional well-being of a child, then a finding under the predicate ground is supportable. *See Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). And here, the Department produced evidence that the Father has engaged in a course of repeated criminal conduct, which involved offenses of escalating severity and which resulted in multiple incarcerations.

This evidence began with a misdemeanor charge for possession of marijuana, which occurred when the Father was eighteen years old. The Father pleaded guilty to that charge, and the trial court deferred an adjudication of guilt. When the Father later violated the terms of his community supervision, the trial court adjudicated the Father's guilt and sentenced him to twenty days' confinement in the county jail.

About a year after his release, when he was nineteen years old, the Father was charged with threatening to kill his own father. The Father pleaded guilty to a

misdemeanor charge of making a terroristic threat, and he was sentenced to forty-five days' confinement in the county jail.

Following that release, when he was twenty years old, the Father was arrested on federal charges for aiding and abetting an armed bank robbery, and for brandishing a firearm in furtherance of that robbery. The Father pleaded guilty to both of those felony charges, and he was sentenced to consecutive terms totaling more than ten years' imprisonment. He was also ordered to pay more than $200,000 in restitution.

None of these offenses was directed specifically at the Child, but the predicate ground for endangerment does not require that the parent's conduct be so directed, or that a child actually suffer injury. *See In re J.W.*, 645 S.W.3d 726, 748 (Tex. 2022). Rather, endangerment can be inferred from the parent's misconduct alone, and misconduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See In re V.A.*, 598 S.W.3d 317, 331 (Tex. App.—Houston [14th Dist.] 2020, pet. denied).

Of the offenses mentioned above, only the felony crimes were committed after the Child was born, but a court may consider actions and inactions occurring both before and after a child's birth when assessing whether a parent has engaged in conduct that endangers a child's well-being. *See In re C.A.B.*, 289 S.W.3d 874, 883 (Tex. App.—Houston [14th Dist.] 2009, no pet.). The evidence here established that the Father engaged in such conduct—both before and after the Child's birth—and that this conduct has resulted in multiple incarcerations. Also, this evidence established that the Father has been incarcerated for nearly all of his adult life, and for nearly all of the Child's life. The trial court could have reasonably concluded that this course of criminal conduct and its resulting incarcerations endangered the Child's well-being by subjecting her to a life of uncertainty and instability. *See In re*

6

*J.J.L.*, 578 S.W.3d 601, 612 (Tex. App.—Houston [14th Dist.] 2019, no pet.) ("Routinely subjecting a child to the probability [she] will be left alone because [her] parent is in jail endangers the child's physical and emotional well-being.").

During the trial, the Father did not dispute any of the evidence regarding his criminal convictions. On appeal, however, the Father has suggested that his involvement in the armed bank robbery "may have been indirect" because the facts of that case were never developed and because the record merely showed that he pleaded guilty to "aiding and abetting" the robbery. There is no evidentiary support for the suggestion that the Father's involvement was "indirect." The record actually shows more than the Father suggests—namely, that he pleaded guilty to a separate count of brandishing a firearm in furtherance of the robbery, which is a crime of violence. Also, and more importantly, the record conclusively established that the Father was incarcerated and could not provide for the Child, thereby endangering her physical and emotional well-being.

The Father's appellate argument focuses largely on the Mother. He emphasizes that the Mother endangered the Child by engaging in illegal drug use, by neglecting to administer the Child's medications, and by allowing the Child to be sexually abused by her boyfriend. The Father then argues that these actions and inactions cannot be imputed to him because there was no evidence that he ever had knowledge of them. This argument is legally correct—the Mother's misconduct cannot be imputed to the Father—but that does not change our analysis that the Father's own course of conduct provides an independent basis for the trial court's endangerment finding. *See* Tex. Fam. Code § 161.001(b)(1)(E) (requiring knowledge when the predicate finding is based on the endangering conduct of others).

The Father also suggests that there is insufficient evidence to support the trial court's finding because, after learning of the Mother's endangering conduct, he took protective action by suggesting the names of caregivers who could foster the Child. But this evidence does not controvert the other evidence that the Father's own course of criminal conduct endangered the Child's well-being by subjecting her to a life of uncertainty and instability.

Considered in the light most favorable to the judgment, the evidence is legally sufficient to support the trial court's finding that the Father has engaged in conduct that endangers the Child's physical or emotional well-being. Further, in view of the entire record, we conclude that any disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination was warranted because of the Father's endangerment. Accordingly, we conclude that the evidence is legally and factually sufficient to support the trial court's finding under predicate ground (E). *See In re Z.N.M.*, No. 14-17-00650-CV, 2018 WL 358480, at *6 (Tex. App.—Houston [14th Dist.] Jan. 11, 2018, no pet.) (mem. op.) ("The record establishes Father's illegal drug use, his harmful and irresponsible choices leading to repeated imprisonment, his lack of parenting until the Department located him, and a child left in the Department's care because Father was in jail. In terminating Father's parental rights, the trial court reasonably credited the evidence of the parenting void in Zoe's life and Father's inability to safeguard her physical and emotional well-being.").

This conclusion likewise means that we need not consider the Father's remaining arguments that the evidence is legally and factually insufficient to support the trial court's other findings under predicate grounds (D), (O), and (Q). *See* Tex. R. App. P. 47.1; *In re P.W.*, 579 S.W.3d 713, 728 (Tex. App.—Houston [14th Dist.] 2019, no pet.).

## THE BEST-INTEREST FINDING

We now consider whether the evidence is legally and factually sufficient to support the trial court's other finding that termination of the Father's parental rights was in the Child's best interest.

No specific set of facts is required to establish that termination is in the best interests of a child, but there are several nonexclusive factors that may guide the factfinder's best-interest determination. *See In re L.M.*, 572 S.W.3d 823, 837 (Tex. App.—Houston [14th Dist.] 2019, no pet.). These factors include (1) the desires of the child; (2) the child's emotional and physical needs; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) any acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re E.R.W.*, 528 S.W.3d 251, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *see also* Tex. Fam. Code § 263.307(b) (listing factors to consider in evaluating a parent's willingness and ability to provide the child with a safe environment).

***The Child's Desires.*** The trial began shortly before the Child's seventh birthday, and it ended after her eighth birthday. The Child never testified at any point during the trial, but there was evidence that she told several witnesses, including the Father, that she would prefer to live with her current placement—not the Father. This factor supports the trial court's best-interest finding.

***The Child's Needs.*** The Child was born with a congenital heart defect, and she received a heart transplant at the age of four. Because of that transplant, the Child must take medications to suppress her immune system, which would otherwise reject the donated organ.

The Caregiver, who was described at trial as the Father's "godsister," has received training for all of the Child's medical needs. That training has also been given to the Caregiver's Mother, who was described as the Father's godmother and who had helped raise the Father as a child. Due to his incarceration, the Father has not received the same training, nor is he familiar with the Child's medical team.

There was also evidence that the Father failed to comprehend the seriousness of the Child's medical needs. That evidence took the form of phone calls, in which the Father pleaded with the Caregiver's Mother to not assist the Department in terminating his parental rights. The Father expressed a preference for the Caregiver to return the Child to foster care so that he might be able to exercise his parental rights once he was released from prison. But there was testimony from medical professionals that if the Child were in foster care—as the Father had desired—and if the Child were ever to need to a new heart, then the Child might not receive priority on the transplant list because of her unstable housing situation. The trial court could have reasonably factored this consideration in its best-interest finding.

In addition to her medical needs, the Child also has mental health needs, stemming from the sexual abuse she experienced at the hands of the Mother's boyfriend. The Caregiver has taken the Child to therapy to address these needs. One doctor opined that the Caregiver has been cooperative on the issue of therapy and that the Caregiver has the ability to identify situations in which the Child needs more therapy. By contrast, when the Department's caseworker addressed the well-being

of the Child over the phone with the Father, he tended to focus more on his own plans once he was released from prison.

***Dangers to the Child.*** The Father's criminal history is evidence of endangerment because, as explained above, his repeated incarcerations have subjected the Child to a life of uncertainty and instability.

The Father was incarcerated first for possession of marijuana. Not long after his release, the Father threatened to kill a family member, for which he was incarcerated again.

After his release from that second incarceration, the Father began living with a girlfriend, who gave birth to the Father's son (who is not a subject of this termination proceeding). The Father then conceived the Child with the Mother, as well as a second son with his girlfriend (who is not a subject of this termination proceeding either). Shortly after the birth of the Child, but before the birth of his second son, the Father was involved in an armed bank robbery, for which he was arrested and incarcerated for the third time. During this termination proceeding, the Father was still incarcerated for his involvement in that robbery. He is projected to be released in November 2023, although there was some testimony that he might be released sooner.

There was no direct evidence that the Father knew that the Child had been born at the time of the armed bank robbery. However, the Father could have foreseen that a child would have been born. The Father also knew that he already had a son with his girlfriend, and that another child by her was expected, and yet the Father still knowingly participated in an armed bank robbery, which has subjected all of his children to a life of uncertainty and instability.

11

The trial court could have reasonably considered the Father's past criminal history and inferred that it would continue in the future and that the best interest of the Child would be served by terminating the Father's parental rights. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("A fact finder may infer from a parent's past inability to meet a child's physical and emotional needs an inability or unwillingness to meet a child's needs in the future.").

***Parenting Abilities.*** There was some evidence that the Father parented his first son for several months. However, the Father then participated in an armed bank robbery, which resulted in his incarceration. The Father has not parented the Child at all, nor his second son by his girlfriend.

There was some dispute as to when the Father first learned that the Child had been born. The Department presented evidence that the Father learned of the Child's existence when she was several months old, but the Father testified that he did not know of the Child's existence until the Child was at least three years old. In both of these competing versions, the evidence suggested that the Father was informed of the Child's birth when he was in prison, and then only of the possibility that the Child was his. Nevertheless, there was no evidence that the Father took any actions to confirm his paternity or to protect the Child until after the Department had removed the Child from the Mother.

The Father has participated in a parenting class during his incarceration. The Father also revealed that when he was in high school, he worked at a daycare managed by the Caregiver's Mother, supervising after-school-age children. But the Father left that job when he stopped living with the Caregiver's Mother.

There was no indication that the Caregiver has parented any children of her own, but the Caregiver plans to adopt the Child and raise her alongside the Caregiver's Mother. By the end of the trial, the Caregiver and the Caregiver's

12

Mother had cared for the Child for more than two years. And according to the Department's caseworker, the Child was thriving under their care.

*Programs.* There was no mention of any programs available to the Father to specifically assist him in caring for the Child and promoting her best interests.

*Plans.* The Caregiver hopes to adopt the Child, and she testified that she would allow the Father to have appropriate contact with the Child after his release from prison. Even before the Father's release, the Caregiver has allowed the Child to have contact with her half-siblings, and with her paternal and maternal grandparents.

The Father testified that he is not specifically seeking custody of the Child, but he does not want his parental rights to be terminated. However, the Caregiver could not adopt the Child and provide permanency in the Child's life unless the Father's rights were terminated.

The Department's caseworker testified that when she privately communicated with the Father, he often spoke about his own goals, rather than the goals he had for the Child, or even the well-being of the Child. That observation was similarly true of the Father's trial testimony. The Father did not provide any detailed plans for the Child, but he hoped at least to show to the Child that not all men were bad like the one who had sexually abused her.

*Stability of the Home.* The Father's living situation is not stable. At the time of trial, he was incarcerated, though he hoped to benefit from supervised release, which would allow him to leave prison early. In the event of his supervised release, the Father plans to stay in a halfway house, and then work either at a fast food restaurant or at a soft drink company. Without any corroborating proof, the Father claimed that jobs awaited him at both places of employment. The Father also claimed

that his grandfather could provide him with housing, but the grandfather did not testify.

The Caregiver, by contrast, has a stable living situation. The Caregiver is employed at a hospital. Though she works long hours, the Caregiver can depend on the Caregiver's Mother to watch the Child when she is away.

There was no evidence that the Father has any comparable support network. In fact, his own mother testified that the Father is not allowed in her home.

***The Father's Acts and Omissions.*** When the Father learned that the Child had been removed from the Mother's care, he took swift and protective action to reach out to the Caregiver's Mother, in hopes that she would foster the Child. The Father also took that action before his paternity had even been confirmed by a DNA test. However, the Father has not availed himself of all of the resources available to him while in prison. He discontinued a drug abuse program because he saw no benefit to it, even though he was involved in illegal drug activity before his latest incarceration.

Altogether, the evidence provided the trial court with a substantial basis for doubting whether the Father has the ability to provide the Child with a safe and stable living environment. Viewing the evidence in the light most favorable to the judgment for our legal-sufficiency analysis, and viewing all of the evidence equally for our factual-sufficiency analysis, we conclude that a reasonable factfinder could have formed a firm belief or conviction that termination of the Father's parental rights was in the best interest of the Child.

## CONCLUSION

The trial court's judgment is affirmed.


/s/    Tracy Christopher
Chief Justice


Panel consists of Chief Justice Christopher and Justices Jewell and Spain. (Spain, J., concurring without opinion).