**Affirmed and Opinion filed May 7, 2019.**



In The

# Fourteenth Court of Appeals

## NO. 14-18-01055-CV

## IN THE INTEREST OF J.J.L., A CHILD

**On Appeal from the 309th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2017-29993**

### O P I N I O N

This accelerated appeal arises from a final decree in a suit in which termination of the parent-child relationship was at issue. *See* Tex. Fam. Code Ann. § 109.002(a-1). The child is Josh. The parents are D.W. (Mother) and J.F. (Father).[1] The trial court terminated both parents' parental rights and appointed the Texas Department of Family and Protective Services (the Department) to be Josh's managing conservator. Only Mother appeals.

On appeal, Mother challenges the sufficiency of the evidence to support

---

[1] We use pseudonyms or initials to refer to the children, parents, and other family members involved in this case. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

termination. We conclude legally and factually sufficient evidence supports the trial court's findings that (1) Mother had a parent-child relationship terminated with respect to another child based on a finding that Mother's conduct endangered that child; and (2) termination of Mother's parental rights is in Jeff's best interest. Therefore, we affirm the trial court's decree.

## BACKGROUND

### A.    Removal

Josh was born in mid-February 2017, at which time Mother's two daughters, Julia and Debby, were already under Department care. The Department received a referral expressing concern about Josh due to "ongoing concerns of substance abuse, unregulated mental health issues and [Mother] being a flight risk." Additionally, the report alleged Mother was not complying with the service plan the Department had created for her with respect to Julia and Debby. After speaking with Mother and Father (who had not yet been confirmed to be Josh's father), the Department placed Josh with relatives under a Parental Child Safety Placement agreement (PCSP).

Ten days after Josh was born, Mother was arrested for stealing a car. She told the Department she had only borrowed the car from a friend.

In early May 2017, the Department formally removed Josh from Mother's care and filed this lawsuit. The record does not reflect why removal was made at that time. The trial court appointed the Department to be Josh's temporary managing conservator, and he remained in his PCSP.

### B.    Family service plan

Following a full adversary hearing, the trial court signed an order requiring Mother to comply with any family service plan by the Department. The service plan would identify the goals she needed to achieve and tasks and services she needed to

2

complete before Josh could be returned to her care. Though it appears a service plan was created for Mother, no service plan is included in the appellate record.

## C.     Termination of parent-child relationship with Julia and Debby

In January 2018, the trial court terminated Mother's parental rights with respect to Julia and Debby. Each decree states the trial court found by clear and convincing evidence that Mother had, in relevant part:

> knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child, pursuant to § 161.001(b)(1)(D), Texas Family Code; [and]

> engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child, pursuant to § 161.001(b)(1)(E), Texas Family Code.

This court affirmed those decrees in a single opinion in July 2018. *See* No. 14-18-00050-CV, *In re D.E.W. a/k/a D.W.* and No. 14-18-00101-CV, *In re J.D.W.*, 2018 WL 3432255 (Tex. App.—Houston [14th Dist.] July 17, 2018, no pet.) (mem. op.) (finding sufficient evidence to support finding under § 161.001(b)(1)(E)) .

## D.     Trial

### 1.     Evidence about Mother

***Drug abuse.*** Mother testified about her drug use, as did caseworker Alexandra Brown. No drug test results are included in the record on appeal. Accordingly, the record reflects the types but not the quantities of drugs Mother consumed.

Trial testimony revealed a pattern by Mother: periods of substance abuse, followed by brief periods of sobriety, then relapses. Brown testified she referred Mother at least three times for a substance abuse assessment. Mother reportedly attended some substance abuse counseling sessions after the first assessment but was discharged as unsuccessful. The third referral for an assessment came after Mother,

while in jail in the spring of 2018, told Brown she understood she had a drug problem. She allegedly said she wanted to go to an inpatient rehabilitation facility because outpatient rehabilitation treatment "doesn't work" for her.

Mother admitted to smoking marijuana before and after this case began. She denied using cocaine, amphetamine, or methamphetamine, even though she reportedly tested positive for each of those substances in July 2018. She said she was "unstable" and "at the wrong place at the wrong time." Mother testified she relapsed on her younger daughter's birthday at the end of August 2018 by smoking marijuana.

At the time of trial, Mother had completed the assessment but said she "was waiting" for the Department to arrange inpatient treatment, even though, according to Brown, Mother told her she was on a list for self-admission to a substance abuse treatment facility. She was not attending Narcotics Anonymous or Alcoholics Anonymous. She did not have a sponsor or a support system to help her combat substance abuse but was going to look for one. Though the record suggests she had not begun outpatient rehabilitation at the time of trial, Mother testified she would "continue" outpatient treatment.

*Criminal history.* The record reflects a 13-year criminal history for Mother. In 2005 and again in 2011, she pleaded guilty to failing to identify herself to the police by giving a false or fictitious name. She was arrested in 2007 for driving while intoxicated and possession of zero to two ounces of marijuana; the criminal court sentenced her to 10 days' incarceration on each charge and suspended her driver's license for one year. Nine months later, Mother pleaded guilty to driving with a suspended license. Her license was still suspended near the end of 2010, when she pleaded guilty to second charge of driving with a suspended license. Mother testified her driver's license had been suspended "for years." She admitted to driving many times with a suspended license, including driving herself to court that day, and

acknowledged one or both of her daughters were frequently in the car.

In 2013, Mother pleaded guilty to possession of Methylone, for which she was sentenced to serve 180 days in jail. Mother pleaded guilty the following year for possession of a controlled substance in penalty group 3; the record does not identify the substance.

The years 2015 through 2017 are marked by Mother's repeated thefts of relatively low-valued property, including body wash, laundry detergent, underwear and other clothing, baby clothes, make-up, and a chair.

Mother testified she was arrested for public intoxication during the termination trial regarding her daughters in the fall of 2017. She said she served "some jail time" for that offense.

Roughly six months before trial in this case, Mother was supposed to submit to a urine drug test. She was arrested for "unlawfully, intentionally and knowingly us[ing] a substance designed to falsify drug test results, to-wit: [Mother] used water to pass as urine." She pleaded guilty and was sentenced to 30 days' incarceration.

Mother was arrested in 2009 for the second-degree felony of aggravated assault with a deadly weapon; the indictment alleged she intentionally and knowingly threatened the complainant with imminent bodily injury by using and displaying a firearm. Under a plea-bargain agreement with the State, she pleaded guilty to the lesser offense of assault causing bodily injury, a class A misdemeanor. She was sentenced to serve seven months in jail.

Mother acknowledged at trial that she had an open criminal case in Galveston County. No details about the nature of that case appear in the record.

***Service plan.*** As stated above, no service plan was offered into evidence or appears in the clerk's record, but it is undisputed such a plan existed. The only

evidence about the plan and Mother's compliance with it comes from the testimony of Mother and Brown.

Brown testified Mother completed several services but had to be re-referred following relapses. If Mother's rights were not terminated, Brown said, Mother would have to repeat certain services, including a psychiatric assessment, individual counseling, and substance abuse counseling. Brown said Mother had not demonstrated the ability to maintain a stable household or stable income.

***Willingness and ability to parent.*** Mother testified she wants Josh to stay in his current placement with his sisters at least temporarily, regardless of whether her parental rights are terminated. She said remaining in that home for the time being, while she works to better herself as a parent, is in Josh's best interest. She asked the court to give her a "second chance" to prove herself capable of parenting Josh. She said she was grateful for the foster parents' care of her daughters. Mother seemed to hold a different sentiment about 10 days before she gave birth to Josh. At that time, Julia and Debby were to be moved from their grandmother's home to the foster home. Mother absconded with the girls through a window. She reportedly could not be found for approximately eight hours, though Mother testified she took the children to McDonalds and was gone for only two or three hours.

For the first year or so of Josh's life, Mother visited him regularly. Caseworker Brown testified Mother drove to the visits, despite her suspended driver's license. Brown said Mother did not request a bus pass or other means of transportation from her. Mother sometimes provided Josh with toys and clothes, and the visits were appropriate. However, according to Brown, Mother would loiter in the parking lot in her car, such that Brown had to use an alternate exit to bring Josh back to his caregiver. Mother denied that accusation and said she was waiting for a ride.

Brown testified Mother missed two visits and was regularly tardy to the visits,

but Mother contended she missed only one. For one missed visit, Mother texted Brown that her car had a flat tire. She attached a photo of a flat tire to the text message. It turned out the photo was not of Mother's tire; it was an image that appeared on a Google search for "flat tire." Mother's visits were suspended in March 2018 due to her falsification of her drug test results. When asked on cross-examination to admit she had a "history of telling untruthful statements" to the court while under oath, Mother replied "depending on what it was."

Mother testified she previously worked as a stripper but stopped when she discovered she was pregnant with Josh. Over the duration of this case, Brown said, Mother told her she worked for various restaurants, a car dealership, and a cell phone store. Brown was able to verify employment with the cell phone store only. Mother still worked at the cell phone store 40 hours per week at the time of trial and was trying to secure a second job. She had rented an apartment about two months before trial began.

Trial testimony indicates Mother had difficulty controlling her anger. She testified she took anger management classes previously and wanted to take them again. Brown testified Mother threatened Brown's son in a phone call with Brown. Mother denied making such a threat.

Court Appointed Special Advocate (CASA) Kimberly Carter was very familiar with Mother and her children. She was the CASA for Julia and Debby in Mother's first case and for Josh in this case. Carter testified Mother has not progressed over the three years since the case with Julia and Debby began. Brown and Carter both implied it was not in Josh's best interest to afford Mother more time to complete services because she had had more time than usual and had not taken advantage of the services already offered. They believed Mother's parental rights with respect to Josh should be terminated.

## 2. Evidence about Josh

Josh had been in Department custody nearly his entire life. He was placed first with fictive kin and moved to his sisters' foster home around the time he turned one year old, roughly seven or eight months before trial.

Josh suffers from fetal alcohol syndrome disorder and has many special needs as a result. Carter offered this account:

> [Josh] has been diagnosed actually under an umbrella of globally developmentally delayed, which covers all of his diagnoses, including the fetal alcohol syndrome disorder. He is delayed per the ECI [Early Childhood Intervention] assessment in just about every category: Fine motor skills, cognitive speech.

> He is, for the most part, nonverbal. He has—he will have some issues with his eyes. They've been told that he will probably also have a learning disability, and when he gets older he will be tested for autism. He has a lack of coordination from the fetal alcohol syndrome. He doesn't have all of the full features, but he has some of the symptoms. They are working on his verbal.

> ECI cut back on his therapy [and] the placement . . . is using her own medical insurance to get him additional therapy to help with his speech.

Due to his condition, Josh regularly sees a neurologist and ophthalmologist and receives speech therapy, occupational therapy, and physical therapy.

Brown and Carter agreed the foster home is safe and stable and meeting all of Josh's physical and emotional needs. Josh was said to be progressing and thriving in their care. Carter did not believe Mother could meet Josh's needs. They testified termination of Mother's parental rights is in in Josh's best interest so he can have the permanency of being adopted by his foster parents, who also plan to adopt his sisters.

8

### 3. Trial court's findings

The trial court found Mother engaged in the conduct described in subsections D, E, M, and O of section 161.001(b)(1) of the Family Code. The court additionally found termination of her parental rights was in Josh's best interest. The trial court appointed the Department to be Josh's managing conservator. Mother timely appealed.

## ANALYSIS

## I. Burden of proof and standards of review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *See In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980); *In re J.E.M.M.*, 532 S.W.3d 874, 879 (Tex. App.—Houston [14th Dist.] 2017, no pet.). However, the child's emotional and physical interests must not be sacrificed to preserve parental rights. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Parental rights may be terminated if clear and convincing evidence shows (1) the parent committed an act described in section 161.001(b)(1) of the Family Code, and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b)(1), (2). Only one predicate finding under section 161.001(b)(1), along with the best-interest determination, is necessary to support termination. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007. This high burden reflects the severity of termination.

The heightened burden of proof results in heightened standards of review for evidentiary sufficiency:

- *Legal sufficiency.* We consider all the evidence in the light most favorable to the

finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. We assume the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence a reasonable fact finder could disbelieve. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

- *Factual sufficiency.* We consider and weigh all the evidence, including disputed or conflicting evidence, to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. We consider whether disputed evidence is such that a reasonable fact finder could not have resolved that dispute in favor of its finding. *C.H.*, 89 S.W.3d at 25.

The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam). We may not second-guess the fact finder's resolution of a factual dispute by relying on disputed evidence or evidence the fact finder "could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003).

## II. Predicate ground for termination: previous termination based on endangerment (161.001(b)(1)(M))

In her first three issues, Mother challenges the sufficiency of the evidence to support the trial court's findings under subsections D, E, and O of section 161.001(b)(1) of the Family Code. However, she does not challenge the sufficiency of the evidence to support the trial court's finding under subsection M. Unchallenged findings bind us "unless the contrary is established as a matter of law, or if there is no evidence to support the finding." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *see In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013) (affirming termination based on unchallenged findings supported by record); *In re E.A.F.*, 424 S.W.3d 742, 750 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

If termination is in the best interest of the child, the parent-child relationship may be terminated if the trial court finds by clear and convincing evidence that the

parent has "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law of another state[.]" Tex. Fam. Code Ann. § 161.001(b)(1)(M). Mother's parental rights to Julia and Debby were terminated based on findings that her conduct violated subsections D and E. Both termination decrees were admitted into evidence and are included in the appellate record. The terminations were upheld on appeal. Because there is evidence to support the unchallenged finding under subsection M, we are bound by that finding. Accordingly, we do not review the findings regarding subsections D, E, and O. *See A.V.*, 113 S.W.3d at 362.

We overrule Mother's first, second, and third issues.

## III. Best interest

Mother's fourth issue challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of parental rights is in Josh's best interest.

### A. Legal standards

Termination must be in the child's best interest. Tex. Fam. Code Ann. § 161.001(b)(2). Texas courts presume two conditions to be in a child's best interest: (1) prompt, permanent placement in a safe environment, *id.* § 263.307(a); and (2) remaining with the child's natural parent. *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). The best-interest analysis focuses on the child, not the parent. *In re K-A.B.M.*, 551 S.W.3d 275, 287 (Tex. App.—El Paso 2018, no pet.).

Courts may consider these non-exclusive factors, known as the *Holley* factors, in its best-interest analysis: the desires of the child; the physical and emotional needs

of the child now and in the future; the physical and emotional danger to the child now and in the future; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking custody in promoting the best interest of the child; the plans for the child by the individuals or agency seeking custody; the stability of the home or proposed placement; acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). This list of factors is not exhaustive, and evidence is not required on all the factors to support a finding that termination is in the child's best interest. *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). The Family Code also identifies factors the court may consider in evaluating a parent's willingness and ability to provide the child with a safe environment. Tex. Fam. Code Ann. § 263.307(b).

## B. Application

### 1. Josh

When a child is too young to express his desires, the fact finder may consider that the child has bonded with the foster family, is well cared for by them, and has spent minimal time with a parent. *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.–Houston [14th Dist.] 2014, no pet.). The undisputed evidence shows Josh is well cared for by his foster parents and thriving under their care. He has never lived with Mother. Mother expressed her own desire that Josh stay with his foster parents even if her rights were not terminated. Remaining in his foster home also allows Josh to continue to live with his biological sisters, Julia and Debby.

Josh has special needs associated with fetal alcohol syndrome disorder. His foster parents ensure he receives appropriate treatment and therapy, including using

12

their own health insurance to pay for his care when necessary.

### 2. Mother

***Endangerment.*** "To endanger" a child means to expose him to loss or injury or to jeopardize his emotional or physical health. *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996); *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). "Conduct" includes acts and failures to act. *See In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Endangerment contemplates a voluntary, deliberate, and conscious course of conduct by the parent. *S.R.*, 452 S.W.3d at 361. A court properly may consider actions and inactions occurring both before and after a child's birth to establish a "course of conduct." *In re S.M.*, 389 S.W.3d 483, 491–92 (Tex. App.—El Paso 2012, no pet.). While endangerment often involves physical endangerment, the conduct need not be directed at a child, nor must the child actually suffer injury. Rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re R.W.*, 129 S.W.3d 732, 738–39 (Tex. App.—Fort Worth 2004, pet. denied). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re A.L.H.*, 515 S.W.3d 60, 92 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

A parent's continuing substance abuse can qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *L.G.R.*, 498 S.W.3d at 204. A parent's drug use exposes the child to the possibility the parent may be impaired or imprisoned and, thus, unable to take care of the child. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617–18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Continued illegal drug use after a child's removal is conduct that jeopardizes

parental rights and may be considered as establishing an endangering course of conduct. *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253–54 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (en banc). The fact finder may give "great weight" to the "significant factor" of drug-related conduct. *L.G.R.*, 498 S.W.3d at 204.

Mother has used drugs for years, both before and after her children were born. She acknowledged her recurrent pattern of drug use–sobriety–relapse. Mother insisted she has accepted responsibility for her drug use, wants to stop, and will seek rehabilitation treatment. The trial court was free to discredit her self-serving testimony. *See H.R.M.*, 209 S.W.3d at 109 (fact finder is sole arbiter when assessing credibility and demeanor of witnesses). Further, Mother denied using cocaine, amphetamine, or methamphetamine, despite testing positive for all three substances a few months before trial. A parent's unwillingness to admit she has a substance abuse problem suggests she will continue to abuse drugs and therefore continue to endanger her child. *See In re A.J.E.M.-B.*, Nos. 14-14-00424-CV, 14-14-00444-CV, 2014 WL 5795484, at *5 (Tex. App.—Houston [14th Dist.] Nov. 6, 2014, no pet.) (mem. op.) (considering evidence that parents "minimized concerns and were in denial of the impact that substance use has on their ability to sufficiently be in tune to the needs of their child"); *In re E.H.*, No. 02-09-00134-CV, 2010 WL 520774, at *4–*5 (Tex. App.—Fort Worth Feb. 11, 2010, no pet.) (mem. op.) (considering father's denial that his drug use and drug dealing harmed his children as factor in endangerment analysis).

In any event, substance abuse is "hard to escape," and the fact finder is "not required to ignore a long history of dependency . . . merely because it abates as trial approaches." *In re M.G.D.*, 108 S.W.3d 508, 513–14 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). The trial court may reasonably decide a parent's changes

before trial are too late to impact the best-interest decision. *See In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied). Although a reasonable fact finder could look at Mother's attempts at sobriety and decide they justified the risk of keeping her as a parent, we cannot say the trial court acted unreasonably in finding Josh's best interest lay elsewhere. *M.G.D.*, 108 S.W.3d at 514. It is not our role to reweigh the evidence on appeal, and we may not substitute our judgment of Josh's best interest for the considered judgment of the fact finder. *See id.* at 531 (Frost, J., concurring in judgment).

A parent's criminal conduct and imprisonment are relevant to the question of whether the parent engaged in a course of conduct that endangered the well-being of the child. *S.R.*, 452 S.W.3d at 360–61; *A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 712–13 (Tex. App.—El Paso 2012, no pet.). Imprisonment alone is not an endangering course of conduct but is a fact properly considered on the endangerment issue. *Boyd*, 727 S.W.2d at 533–34. Routinely subjecting a child to the probability he will be left alone because his parent is in jail endangers the child's physical and emotional well-being. *S.M.*, 389 S.W.3d at 492.

Mother's 13-year criminal history spans most of her adult life. Three convictions are rooted in deception: two for failure to identify herself to a police officer by giving a false or fictious name, and a recent one for falsification of a drug test result. She also admitted to perjuring herself "depending on what it was." Mother flaunted the law by driving with a suspending license for "years," at times with her daughters in the car. Mother pleaded guilty to four thefts in three years. She has several convictions tied to her substance abuse: one for driving while intoxicated and two for possession of a controlled substance. Her sole conviction involving violence, assault with bodily injury, was reduced from felonious aggravated assault with a deadly weapon.

15

***Willingness and ability to parent.*** Mother testified she was working full time and had recently rented an apartment. She acknowledged she was not in a position at the time of trial to take care of Josh, due in part to her need for drug rehabilitation treatment. She asked the trial court to give her a "second chance" so she could complete more services and improve as a parent. Caseworker Brown and CASA Carter countered that Mother squandered multiple second chances during her lengthy history with the Department.

***Programs available.*** Other than the substance-abuse, counseling, and other services previously made available to Mother through her family service plan, there is no evidence regarding programs available to assist Mother.

### C.    Conclusion

Applying the standards of review stated above, we conclude the evidence is legally and factually sufficient to support the trial court's best-interest finding. We overrule Mother's fourth issue.

### CONCLUSION

We affirm the trial court's final decree.

/s/     Jerry Zimmerer
Justice

Panel consists of Justices Christopher, Bourliot, and Zimmerer.