**Affirmed and Majority and Concurring Opinions filed July 22, 2024.**



In The

# Fourteenth Court of Appeals

### NO. 14-24-00062-CV

## IN THE INTEREST OF J.A.R., A CHILD

**On Appeal from the 313th District Court
Harris County, Texas
Trial Court Cause No. 2022-01692J**

## OPINION

Appellants V.B. ("Mother") and J.R. ("Father") appeal the trial court's final order terminating their parental rights to their son, J.A.R. Both argue that there was factually and legally insufficient evidence to support termination of their parental rights under Texas Family Code § 161.001(b)(1)(E), (O), and (P) and that termination was in J.A.R.'s best interest. Mother additionally argues that the Department of Family and Protective Services ("The Department") should not be named J.A.R.'s permanent managing conservator. Father further argues that the trial court abused its discretion when it denied his motion for continuance and Mother's second motion for continuance. We affirm.

# I. BACKGROUND

J.P.R., J.A.R.'s older brother, was born to Mother and Father on October 11, 2018. Mother and Father also had another child, J.R., who was born on February 29, 2020, and died on July 5, 2020. J.A.R. was born on May 9, 2021, and is the fifth child of Mother and the third child of Father.

At the time J.A.R. was born, Mother and Father had an open case with the Department concerning J.P.R. following J.P.R.'s removal from their care after J.R.'s death in 2020. As a result of that open case, Mother and Father were required to submit to drug testing. On September 12, 2022, Mother tested positive for cocaine, and Father tested positive for cocaine, benzoylecgonine, methamphetamine, and marijuana. The Department then removed J.A.R. from Mother and Father's care on September 30, 2022, and placed him in the same foster home as his older brother, J.P.R. J.A.R. was one year and four months old at the time.

On October 3, 2022, the Department filed its petition seeking the termination of Mother and Father's parental rights to J.A.R. and the appointment of the Department as J.A.R.'s permanent managing conservator ("PMC"). Trial on the Department's petition began on September 12, 2023. The trial court heard testimony from the Department's case worker, Donnisha Tate ("Tate"), Mother, Father, and J.A.R.'s foster mother ("Foster Mother"). The trial court also admitted multiple exhibits into evidence, including in relevant part the Department's removal affidavit, the Department permanency reports in J.P.R.'s and J.A.R.'s cases, and Mother's psychological evaluation.

**The Removal Affidavit**

The Department's removal affidavit states in part:

The parent's oldest child, [J.P.R.], age 3, was removed from the home due to his sibling, [J.R.'s] death in 2020. The parents were co-sleeping with the baby and rolled over onto the child. They were under the influence of cocaine at that time.

. . . .

The parents' prior cocaine use resulted in the death of a child. . . . An Emergency Removal with Exigent Circumstances occurred on September 30, 2022 due to [Mother's] and [Father's] failed drug tests and the risk of harm to the child.

Under a section titled "Criminal History," the affidavit noted five entries for Mother between 2002 and 2015, including for aggravated robbery, theft of property with a value between $50 and $500, and possession of marijuana[1]; Father had thirty-five entries between 2002 and 2018, including multiple offenses for drug possession, burglary of a vehicle, evading arrest, and unauthorized use of a vehicle.

The affidavit also noted Mother and Father's four prior cases with the Department. In 2017, Mother tested positive at the birth of one of her children for cocaine and marijuana and agreed to work services with Family Based Safety Services.

During the Department's investigation into J.R.'s death in 2020, the Department found that J.R. was sleeping in bed with Mother and Father. Mother and Father denied being under the influence of drugs or having used any drugs in the preceding month; however, both parents tested positive for marijuana in their urinalyses and Mother tested positive for marijuana and cocaine in her hair follicle. The Department determined that the sleeping in the same bed with J.R. and the use of drugs "led to the death of" J.R., because J.R. allegedly died as a result of one of

---

[1] Mother's psychological statement recites that Mother "has a juvenile and adult criminal history including charges of Possession of a Controlled Substance, Aggravated Robbery with a Deadly Weapon, Possession of Marijuana, and Theft- Aggregate $50-500, all of which are disposed." Mother "added that she was granted probation for the Aggravated Robbery and the Theft was dismissed."

the parents rolling over him while they were all sleeping in the same bed.[2] These findings also resulted in J.P.R.'s removal.

On May 14, 2021, Father tested positive for cocaine in his hair while completing services but tested negative in a second hair follicle test "immediately following the positive result . . . ." This entry noted that Mother and Father "were aware that another report could lead to permanently losing their children and had a plan in place to ensure that did not happen."

On October 14, 2021, the Department called for an intake after Father tested positive for unspecified drugs in August 2021, and a second set of drug test results showed Father testing negative for drugs in his urinalysis and positive for cocaine in his hair. The affidavit further states that Mother thereafter "removed him from the home and was protective of the child."

The affidavit concludes that the parents tested positive for drugs and that their "previous drug use resulted in the death of their child [J.R.] and the removal of his sibling [J.P.R.] Their continued drug use poses a threat to the safety and well-being of their child [J.A.R.]"

**The Family Service Plan**

Mother and Father's family service plans were signed by them on November 17, 2022. In relevant part, the service plan required Mother and Father to participate in a Narcotics Anonymous ("NA") or Alcoholics Anonymous ("AA") twelve-step program and "participate in relapse prevention by obtaining a sponsor that has been sober for more than five years."

---

[2] Mother's psychological assessment states: "The cause of the death is unknown, but the father reported finding the child deceased after co-sleeping. While investigating the [baby's]death[,] the living conditions for [J.P.] were found to be extremely hazardous and unsanitary. Neither parent appeared concerned about the living conditions and said the home belonged to a relative . . . ."

**The Permanency Reports**

The Department's permanency report in J.P.R.'s case dated June 28, 2023, was admitted into evidence. It states that Mother provided proof of a lease that includes Father. It also notes that she tested positive for cocaine in her hair on September 12, 2022; positive for cocaine in her hair on October 7, 2022; negative in her urine and hair follicle drug tests on 11/15/2022, 12/16/2022, 12/30/2022; and negative urine tests on 1/12/2023, 2/2023, 4/2023, and 5/2023. As to her substance abuse, the report reveals:

> The recommendations state[] that [Mother] meets the criteria for Cocaine use disorder Moderate. It is recommended that [Mother] participate in 24 units of substance abuse didactic groups that will cover Relapse Prevention Early Recovery, HIV/AIDS TB Hep B & C, STDs, Smoking Cessation and Life Skills. 13 units of substance abuse individual counseling sessions. It is also recommended that she complete[] a psycho-social assessment and participate in 14 units of parenting. [Mother] must provide three months of negative drug test while participate [sic] in SOP.

Mother completed her substance abuse individual therapy and attended some of her substance abuse group sessions, but she did not begin a NA/AA twelve-step program because, according to Mother, she was not asked to complete it. The report noted that the case worker explained to Mother that participating in a twelve-step program and obtaining a sponsor "is on her family plan of services and to find a program."

Father completed his substance abuse assessment on May 12, 2022, reporting that he had not used drugs during the previous two-and-a-half years and that he only used marijuana. However, Father's drug screen test results from December 2021 to May 2022 show "that he tested positive for Cocaine monthly in his hair." Father was thus recommended for further drug treatment, but he failed to complete it. The treatment center noted that it called Father "three times in April to

5

scheduled [sic] appointment but no response." Father finally completed his substance abuse therapy in December 2022 but was referred back to substance abuse counseling and treatment in February 2023 due to continued positive drugs screens, including testing positive for cocaine in November 2022. Father tested negative for drugs in December 2022 and monthly between February and May 2023. As of June 2023, Father had not provided documentation to the Department of participation in an NA/AA twelve-step program.

**Trial Testimony**

### 1. Tate

Tate testified that Mother and Father had seven prior cases with the Department and that their drug use has been a common issue in all the cases; that J.P.R. came into the Department's care after a referral for physical neglect and neglectful supervision; and that J.A.R. and J.P.R. were in the same foster home together. Tate explained that Mother began using drugs when she was about fifteen years old and had consistently abused substances for over a decade. She further testified that Mother and Father had not completed their required services.

Tate averred that Mother and Father did not complete the family service plan. Tate asserted that both parents needed to complete their substance abuse treatment in the current case, and that they had failed to obtain a sponsor or complete such treatment in the prior case involving J.P.R. Tate stated that Mother and Father had not provided the Department with a sponsor or a sobriety plan from a NA/AA program as required by the plan. Tate explained that it was important for Mother to continue with community-based substance abuse treatment and/or support "[b]ecause we want to ensure that Mom continues sobriety to provide a safe and substance-free environment for her children."

6

Tate testified that Mother and Father attended their visitations with J.A.R. bi-weekly for two hours. Tate stated she did not see "the bonding, necessarily, between Mom" and J.A.R., but that J.A.R. is "very close" and "very bonded with Dad." Tate explained J.A.R. is "very comfortable" and "very happy" in the foster home and "very bonded" with the foster parents.

Finally, Tate testified that the Department's investigator learned that Mother and Father were co-sleeping with J.R. and rolled over onto the child, causing J.R.'s death. Tate confirmed that Mother and Father tested negative for cocaine in their urine shortly after J.R.'s death. However, Mother and Father tested positive for cocaine in their hair.

### 2. Mother

Mother testified that, at the time of trial, she had a monthly income of about $1,500.00 from two jobs, as well as family assistance, and that she paid $800.00 monthly in rent. Mother testified that she is attending NA/AA meetings but has not started a twelve-step program or obtained a sponsor. Mother explained that she has not obtained a sponsor because she "wasn't comfortable with just opening up to anyone, and [she has not] found anyone similar to [her] age range." Mother stated that she had been reaching out to sponsors for about three months but that she had not asked the individual running the NA group to assist her in finding a sponsor. Mother acknowledged that she had used drugs since she was fifteen years of age and that she knew of the requirement and had agreed at least a year prior to trial to begin a twelve-step program. Mother disputed that J.R. died because Father rolled over him while they were sleeping or that Father had ever stated this.

### 3. Father

Father testified that he was currently looking for a sponsor because his

7

sponsor got sick with COVID and stopped sponsoring individuals. Father denied telling anyone that he had rolled over J.R., and caused his death, and stated he did not know why that was asserted in the Department's affidavit. Father stated he attended almost all his visitations with J.A.R., J.A.R. is bonded with him, and he enjoys spending time with J.A.R. Father did not know why his hair follicles continuously tested positive for drugs and stated that he had been "doing" NA/AA.

Father testified that that he has been employed with a plumbing company since 2022, and that it was very important to him to continue to have a relationship with J.A.R.

### 4. Foster Mother

Foster Mother testified she cares for J.P.R. and J.A.R. Foster Mother and Foster Father are both employed; Foster Mother's parents live with them; and the children have adjusted "too well" to that. Foster Mother stated that J.A.R. was nonverbal when he first came into her care but that he can now communicate, is very happy, is developmentally on track, and is attached and bonded to her, Foster Father, and J.P.R.

Foster Mother explained that they take J.A.R. to doctor visits and are currently waiting on seeking further dental care because J.A.R.'s teeth "are really, really bad, to the extent that the dentist believes it might have been just because of too much milk . . . ." She testified that she and Foster Father are able to meet all of J.A.R.'s physical, emotional and financial needs, take him to all medical and dental appointments, are willing to adopt him, seek assistance for medical expenses and college in the future, and continue to explore his interests and his hobbies. Foster Mother stated that J.A.R is very attached to his older brother, and that splitting them up would be a terrible idea. Foster Mother testified that J.A.R had told her two weeks before trial "Mommy, I'm so happy, I'm so happy."

8

**Trial Court's Ruling**

The trial court found that termination of Mother and Father's parental rights to J.A.R. was proper under Family Code § 161.001(b)(1)(E), (O), and (P) and in J.A.R.'s best interest. On January 5, 2024, the trial court signed a final order of termination and appointed the Department as J.A.R.'s PMC. This appeal followed.

## II.  STATUTORY PREDICATE GROUNDS FOR TERMINATION

Mother's first three issues challenge the legal and factual sufficiency supporting the trial court's finding that termination of her parental rights was proper under § 161.001(b)(1)(E), (O), and (P). Father's issues two through four raise the same challenges to the same findings concerning him. We focus our analysis on the trial court's finding under subsection (E) as to both parents—that Mother and Father engaged in a course of conduct that endangered the safety and wellbeing of J.A.R.—because it is dispositive as to these issues.

### B.  APPLICABLE LAW & STANDARD OF REVIEW

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *See In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980); *In re J.E.M.M.*, 532 S.W.3d 874, 879 (Tex. App.—Houston [14th Dist.] 2017, no pet.). However, the child's emotional and physical interests must not be sacrificed to preserve parental rights. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

• **Legal sufficiency.** We consider all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. We assume the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence a reasonable fact finder could disbelieve. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

9

• **Factual sufficiency.** We consider and weigh all the evidence, including disputed or conflicting evidence, to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. We consider whether disputed evidence is such that a reasonable fact finder could not have resolved that dispute in favor of its finding. *In re C.H.*, 89 S.W.3d at 25.

Subsection (E) allows for termination if the parent has engaged in conduct which endangers the physical or emotional well-being of the child. Tex. Fam. Code Ann. § 161.001(b)(1)(E). Under subsection E, the evidence must show the endangerment was the result of the parent's conduct, including acts, omissions, or failure to act. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Termination under subsection E must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* Courts may consider conduct both before and after the Department removed the child from the home and both before and after the child is born. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re S.R.*, 452 S.W.3d at 360.

To "endanger" means to expose the children to loss or injury or to jeopardize their emotional or physical health. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam); *In re S.R.*, 452 S.W.3d at 360. A child is endangered when the environment creates a potential for danger and the parent is aware of the danger but consciously disregards it. *In re J.E.M.M.*, 532 S.W.3d at 881.

"While illegal drug use alone may not be sufficient to show endangerment, a pattern of drug use accompanied by circumstances that indicate related dangers to the child can establish a substantial *risk* of harm" *In re R.R.A.* 687 S.W.3d 269, 278 (Tex. 2024) (emphasis in original). Further, a parent's neglect of her child's

medical or dental needs endangers the child, *In re J.H.*, No. 01-22-00629-CV, 2023 WL 2169952, at *14 (Tex. App.—Houston [1st Dist.] Feb. 23, 2023, pet. denied) (mem. op.); *see, e.g., In re E.A.D.*, No. 14-22-00025-CV, 2022 WL 2663981, at *5 (Tex. App.—Houston [14th Dist.] July 11, 2022, no pet.) (mem. op.), as well as a parent's failure to properly supervise her young child. *See In re M.C.*, 917 S.W.2d 268, 269–70 (Tex. 1996) (per curiam).

## C.  ANALYSIS

Mother argues that the evidence is legally and factually insufficient because there is no evidence of a causal link showing that her drug use endangered or harmed the children. Father "acknowledges his struggle with illegal drugs through the pendency of this case and the prior case" but argues that "there is no evidence that his testing positive on September 30, 2022, would have endangered nor placed his son, [J.A.R.], at risk." Father further acknowledges that "it would be futile to argue that there was no causal connection between father's illegal drug usage and J.A.R.'s endangerment" due to the recent Texas Supreme Court opinion in *In re R.R.A.* 687 S.W.3d 269, 278 (Tex. 2024).

In relevant part, the Department sought the termination of Mother and Father's parental rights to J.A.R. based on their long history of drug use—which resulted in the death of one of their children and the removal of their other two children—because Mother and Father failed to engage in the services required to address their drug use and maintain a sober life. Specifically, they failed to complete or in the case of Father, failed to participate in a NA/AA twelve-step program with a sponsor.

Here, there was evidence that one child of Mother and Father died as a result of their drug use; that a second child had been removed because of their drug use; that they had multiple cases with the Department because of their drug use; that

11

Mother did not properly care for any of the five children she had given birth to; that Mother and Father had used drugs for over a decade; and that Mother and Father had a criminal history that coincided with their drug use. This evidence supports the trial court's finding. *See In re R.R.A.*, 687 S.W.3d at 281 ("When a pattern of drug use is coupled with credible evidence of attendant risks to employment, housing, and prolonged absence from the children, a factfinder reasonably can find endangerment to the child's physical or emotional well-being under (D) and (E)."); *In re J.O.A.*, 283 S.W.3d at 345 ("[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct."); *In re J.J.L.*, 578 S.W.3d 601, 612 (Tex. App.—Houston [14th Dist.] 2019, no pet.) ("Routinely subjecting a child to the probability he will be left alone because his parent is in jail endangers the child's physical and emotional well-being.").

Further, Mother and Father's family service plans required them to participate in a NA/AA twelve-step program and "participate in relapse prevention by obtaining a sponsor that has been sober for more than five years." At the time of trial, Mother and Father had not started a 12-step program and had not found sponsors, despite repeated requests by the Department that they do so and despite multiple cases with the Department concerning their drug use. This evidence also supports the trial court's finding. *See In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ("A court properly may consider actions and inactions occurring both before and after the child's birth to establish a 'course of conduct.'"); *In re G.M.M.*, No. 01-20-00159-CV, 2020 WL 5048140, at *9 (Tex. App.—Houston [1st Dist.] Aug. 27, 2020, no pet.) (mem. op.) ("A parent's consistent failure to take advantage of many forms of assistance made available to help her establish safe and stable living conditions for her child may warrant

12

termination of parental rights."); *In re M.L.G.J.*, No. 14-14-00800-CV, 2015 WL 1402652, *10 (Tex. App.—Houston [14th Dist.] Mar. 24, 2015, no pet.) (mem. op.) (noting that "Mother failed to complete parenting classes, participate in individual therapy, and undergo drug abuse treatment demonstrates that the Mother did not prioritize improving her ability to parent the Children" and that these facts were relevant in determining whether a parent's conduct results in endangerment).

Further, Foster Mother testified that J.A.R. was developmentally and emotionally delayed by more than six months when he came into her care. This further supports the trial court's endangerment finding under subsection (E). (3RR 112, 114). *See In re J.R.*, 171 S.W.3d 558, 578 (Tex. App.—Houston [14th Dist.] 2005, no pet.) ("[F]ailure to provide for the children's needs . . . may also support a finding under subsection 161.001(1)(E).").

Viewing this evidence in the light most favorable to the trial court's finding, we conclude that a factfinder could have reasonably found that Mother and Father's continued drug use and failure to participate in drug counseling constituted a course of conduct that endangered the emotional or physical well-being of J.A.R. *See Boyd*, 727 S.W.2d at 533 ("While we agree that 'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury. . . . '[E]ndanger' means to expose to loss or injury; to jeopardize."); *In re S.R.*, 452 S.W.3d 360 ("A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being."). Furthermore, viewing all of the disputed evidence that a reasonable factfinder could not have credited in favor of this finding, we conclude that such evidence is not so significant that a factfinder could not reasonably have formed a firm belief or conviction that this finding was true.

13

*See In re J.O.A.*, 283 S.W.3d at 344; *see also In re S.R.*, 452 S.W.3d at 365 ("As the finder of fact and sole judge of the credibility of the witnesses, the trial court was free to disregard any or all of the parents' self-serving testimony."). We conclude that there is legally and factually sufficient evidence supporting the trial court's finding that termination was proper under subsection (E).

Finally, we note that Mother argues that the evidence is insufficient to support the court's finding because drug use alone is insufficient to establish an endangering course of conduct. She further argues that the Family Code requires a causal connection between the parent's conduct and the alleged endangerment. Contrary to Mother's argument, circumstances that indicate related dangers to the child can establish a substantial risk of harm. *See In re R.R.A.*, 687 S.W.3d at 278. We thus conclude that this argument is unmeritorious.

We overrule Mother's first issue and Father's second issue.[3]

## III.   BEST INTEREST FINDING

Mother's fourth issue and Father's fifth issue challenge the legal and factual sufficiency of the evidence supporting the trial court's finding that termination of their parental rights was in J.A.R.'s best interest.

## A.   APPLICABLE LAW

In determining the child's best interest, the factfinder may consider the *Holley* factors: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the

---

[3] Because only one ground is needed for termination, we need not address Mother's second and third issues and Father's third and fourth issues challenging the sufficiency of the evidence supporting termination under subsections (O) and (P). *See* Tex. R. App. P. 47.4; *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam).

14

programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parents' acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are non-exclusive, and the best interest finding does not require proof of any unique set of factors. *See In re J.J.C.*, 302 S.W.3d 436, 447 (Tex. App.—Houston [14th Dist.] 2009, pet. denied).

Stability and permanence are paramount in the upbringing of children. *In re J.D.*, 436 S.W.3d 105, 120 (Tex. App.—Houston [14th Dist.] 2014, no pet.). The factfinder must weigh the parent's abilities to meet the child's needs and any programs available to help her do so. *In re M.A.A.*, No. 01-20-00709-CV, 2021 WL 1134308, at *36 (Tex. App.—Houston [1st Dist.] Mar. 25, 2021, no pet.) (mem. op.).

**B.   ANALYSIS**

**(1) the desires of the child; (2) the present and future physical and emotional needs of the child; and (3) the present and future emotional and physical danger to the child**

J.A.R. was two years old at the time of the final hearing and too young to express his desires. Under these circumstances, the factfinder may consider with whom the child has bonded, whether the child is receiving good care in that placement, and whether the child has spent minimal time with a parent. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

Here, there was evidence that J.A.R was not bonded with Mother but was strongly bonded with Father. There was also evidence that J.A.R. was a happy

child who is "very comfortable" and "very happy in the foster home and was strongly bonded with his foster parents as well as his brother." Foster Mother testified that J.A.R had told her two weeks before trial "Mommy, I'm so happy, I'm so happy." This evidence supports termination as to Mother and is neutral as to Father.

It is undisputed that Mother and Father have used drugs for many years, and both have a criminal history and a history of cases with the Department that coincides with that drug use, albeit Father's criminal history is more extensive and more recent. This supports the court's best interest finding. *See In re R.R.A.*, 687 S.W.3d at 281 ("When a pattern of drug use is coupled with credible evidence of attendant risks to employment, housing, or prolonged absence from the children, a factfinder can reasonably find endangerment to the child's physical or emotional well-being . . . ."); *In re S.H.*, No. 01-22-00255-CV, 2022 WL 17254956, at *18 (Tex. App.—Houston [1st Dist.] Nov. 29, 2022, pet. denied) (mem. op.) ("Criminal activity that exposes a parent to the potential for incarceration is relevant to the trial court's best-interest determination."); *In re T.L.S.*, No. 01-12-00434-CV, 2012 WL 6213515, at *6 (Tex. App.—Houston [1st Dist.] Dec. 13, 2012, no pet.) (mem. op.) ("A parent's . . . criminal history may support a finding that termination of parental rights is in the best interest of a child."). Further, Mother and Father did not comply with crucial portions of their family service plan intended to address their drug use for the long term. This also supports the trial court's best interest determination. *See In re E.C.R.*, 402 S.W.3d 239, 249–50 (Tex. 2013); *In re A.J.D.-J.*, 667 S.W.3d 813, 824 (Tex. App.—Houston [1st Dist.] 2023, no pet.) ("[W]hen a parent does not try to abide by the plan, the factfinder may reasonably infer the parent is indifferent to the goal of family reunification."); *In re S.R.*, 452 S.W.3d at 367 ("The factfinder may infer from past conduct

16

endangering the child's well-being that similar conduct will recur if the child is returned to the parent."); *S.L. v. Dep't of Fam. & Protective Servs.*, No. 14-22-00194-CV, 2022 WL 4103250, at \*8 (Tex. App.—Houston [14th Dist.] Sept. 8, 2022, pet. denied) (mem. op.) ("Given the connection between a service plan and the *Holley* and statutory factors, a parent's actions with regard to the service plan are relevant to a child's best interest.").

**(4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement**

Mother's psychological assessment from August 26, 2023, notes that Mother "reported a notable substance abuse history involving cocaine and marijuana, with cocaine being her drug of choice," stating that she started using it consistently when she was about twenty-three years old.[4] Mother "has participated in various types of substance abuse treatment, including individual and group sessions, 'rehab' while she was in jail, and Narcotics Anonymous (NA) classes."

Mother has five children, all of whom have been removed from her care, and the same is true of Father's three children. There is evidence in the record that Mother at times has suggested signing away her rights to some of her relatives. One of Mother and Father's children died as a result of conduct related to drug use. Mother's psychological assessment states the Department's records note that at the time J.P. died "the house looked like it had not been cleaned in years and the conditions are unsanitary."

Mother testified that she is employed, has a home, and has five sisters and a

---

[4] Mother's psychological report further provides that Mother began using marijuana consistently at the age of fifteen or sixteen and that she first used cocaine when she was fifteen or sixteen.

mother that support her. Father testified that he is also employed and lives with his father, and Tate testified that Father provides J.A.R. with anything J.A.R wants.

However, Foster Mother testified that J.A.R. was nonverbal and developmentally and emotionally delayed by more than six months when he came into her care and that that J.A.R. needs dental work because "[h]is teeth are really, really bad, to the extent that the dentist believes it might have been just because of too much milk, but they're really not good." *See In re L.S.S.*, No. 14-22-00822-CV, 2023 WL 2707210, at *8 (Tex. App.—Houston [14th Dist.] Mar. 30, 2023, pet. denied) ("A child's basic needs include medical and dental care."); *In re K.S.O.B.*, No. 01-18-00860-CV, 2019 WL 1246348, at *19 (Tex. App.—Houston [1st Dist.] Mar. 19, 2019, no pet.) (mem. op.) ("[T]he trier of fact may infer from a parent's past inattention to her children's medical needs that such inattention will continue in the future."); *In re S.J.*, No. 14-07-00785-CV, 2009 WL 442485, at *4 (Tex. App.—Houston [14th Dist.] Feb. 24, 2009, no pet.) (mem. op.) ("When deciding termination is in S.J.'s future best-interest, the trial court could have reasonably considered that appellant neglected her newborn during such a critical time."). Further, there is evidence that Foster Mother has been attentive and diligent in seeking medical care for J.A.R.; that J.A.R. is thriving under Foster Mother and Foster Father's care; and that J.A.R. has significantly improved after being removed from Mother's care and placed with his foster parents and his older brother. *See In re M.T.*, No. 14-22-00198-CV, 2022 WL 3204819, at *9 (Tex. App.—Houston [14th Dist.] Aug. 9, 2022, no pet.) (mem. op.); *In re M.A.A.*, 2021 WL 1134308, at *21; *In re L.M.N.*, No. 01-18-00413-CV, 2018 WL 5831672, at *20 (Tex. App.—Houston [1st Dist.] Nov. 8, 2018, pet. denied) (mem. op.). As a result, J.A.R. is now developmentally on track and can now speak and express his emotions. J.A.R.'s foster parents are able to take him to all of his medical and

dental appointments, and are willing to adopt him, seek assistance for medical expenses and college in the future, and continue to explore his interests and his hobbies.

We conclude these factors weigh in favor of termination.

**(8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parents' acts or omissions**

Tate testified that Mother took a psychological evaluation and it was determined that her IQ was in the low range. It notes that she suffered a serious brain injury in a car accident in 2006 and that it has caused some memory loss. Tate acknowledged that Mother may not have progressed through her services as fast as the Department would have liked as a result of her brain injury. However, Tate also confirmed that the psychological evaluation noted that Mother appeared to adequately understand the examiner's questions, that her thought process and content was within normal limits, and that she spoke in an organized and direct manner. Tate testified that she believed Mother understood what was being asked of her and the importance of it, while Mother acknowledged during her testimony that she was reminded of the requirements of her family service plan on a regular basis.

As to Mother's drug use following the removal of J.A.R., Mother tested negative for drugs monthly from November 2022 through her most recent drug test in August 2023. There is also evidence in the record that Mother relapsed in September 2022 following a prior period of sobriety, after reconciling with Father. Mother explained she has not obtained a sponsor and did not begin a twelve-step program because the sponsors wanted Mother to attend a meeting every day, and she is unable to do so given her jobs and other meetings she is required to attend. Mother also testified that she had not obtained a sponsor because she had been

19

unable to find one around her age, but she also testified she had not asked the individual leading the NA/AA meetings for assistance in finding a sponsor.

Father testified that he does not use drugs and that his urine regularly tests negative for drugs. Father, however, regularly tested positive for drugs in his hair, while also testing positive for drugs at times in his urine. Father testified that he previously had a sponsor, but the sponsor became ill with COVID and was unable to continue; that Father was currently trying to find another sponsor and another place to go for NA meetings; and that Father had not "really had a chance" because he works late and has three classes he needs to attend.

Father and Mother denied that J.R. had died as a result of their drug use or as a result of Father rolling over J.R. while they were sleeping.

## C. SUMMARY

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the evidence is legally sufficient that termination of Mother and Father's parental rights was in J.A.R.'s best interest. *See In re J.F.C.*, 96 S.W.3d at 266.

Furthermore, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is not so significant that the factfinder could not have formed a firm belief or conviction that termination was in J.A.R.'s best interest. *See In re A.C.*, 560 S.W.3d at 631. While there is evidence that J.A.R. was strongly bonded with Father; that Mother and Father attended visitations and completed some of the services in their family service plan; that Mother and Father completed some drug treatment programs and counseling, previously participated in NA/AA meetings, that Mother tested negative for drugs for the ten months preceding trial; and that Father and Mother are employed, we

20

cannot conclude that the disputed and contrary evidence is so overwhelming that no reasonable factfinder could have found a firm belief or conviction that J.A.R.'s best interest lay elsewhere. *See In re J.J.L.*, 578 S.W.3d 601, 612 (Tex. App.—Houston [14th Dist.] 2019, no pet.); *In re M.G.D.*, 108 S.W.3d 508, 515 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) ("[W]e believe a parent's turnaround and compliance with a family service plan are factors [to] consider, but not determinative ones. If the facts involved show progress may take a very long time[, then] reasonable jurors may conclude that termination is clearly and convincingly in the child's best interest."); *In re L.S.S.*, No. 14-22-00822-CV, 2023 WL 2707210, at *8 (Tex. App.—Houston [14th Dist.] Mar. 30, 2023, pet. denied) ("[W]hile a child's love for their parent is a very important consideration in determining the best interest of the child, it cannot override or outweigh evidence of danger to the child."). Here, the record shows that the purpose of participating in the N.A. or A.A. twelve-step program and obtaining a sponsor was to prevent Mother and Father from relapsing again and provide them with the necessary tools to maintain a sober life. A fact finder could reasonably find that Mother and Father's lack of interest and urgency in obtaining a sponsor and participating in the twelve-step program, coupled with their criminal history, and their history of drug use and attendant circumstances and consequences, that the risk that they will relapse again is too high and that it is in the best interest of J.A.R. that their rights be terminated. *See In re J.J.L.*, 578 S.W.3d at 609 ("We may not second-guess the fact finder's resolution of a factual dispute by relying on disputed evidence or evidence the fact finder 'could easily have rejected as not credible.'" (quoting *In re L.M.I.*, 119 S.W.3d at 712)); *In re M.G.D.*, 108 S.W.3d at 515.

We overrule Mother's fourth issue and Father's fifth issue.

## IV. MOTION FOR CONTINUANCE

In Father's first issue, he argues that the trial court erred when it denied his motion for a continuance and Mother's second motion for a continuance. Mother did not raise the denial of her continuance as an appellate point.

### A. STANDARD OF REVIEW & APPLICABLE LAW

We review the trial court's ruling on a motion for continuance for an abuse of discretion. *See Gen. Motors Corp. v. Gayle*, 951 S.W.2d 469, 476 (Tex. 1997) (orig. proceeding); *Guzman v. City of Bellville*, 640 S.W.3d 352, 357 (Tex. App.—Houston [14th Dist.] 2022, no pet.). The trial court's denial of a continuance will not be disturbed unless the record discloses a clear abuse of discretion. *Guzman*, 640 S.W.3d at 357 (citing *State v. Wood Oil Distrib., Inc.*, 751 S.W.2d 863, 865 (Tex. 1988)). A trial court abuses its discretion if its decision is arbitrary, unreasonable, and without reference to guiding rules or principles. *Id.*

Texas Rule of Civil Procedure 251 provides that a motion for continuance shall not be granted without "sufficient cause supported by affidavit, or by consent of the parties, or by operation of law." Tex. R. Civ. P. 251; *see Blake v. Lewis*, 886 S.W.2d 404, 409 (Tex. App.—Houston [1st Dist.] 1994, no writ). Thus, when a motion is unsupported by verified facts, appellate courts generally presume the trial court did not abuse its discretion in denying the motion. *See In re S.M.H.*, 523 S.W.3d 783, 797 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *W.W. Webber, L.L.C. v. Harris Cnty. Toll Rd. Auth.*, 324 S.W.3d 877, 880 (Tex. App.—Houston [14th Dist.] 2010, no pet.).

### B. ANALYSIS

Before the second day of trial, Father filed an unsworn written motion for a continuance and Mother filed her second sworn written motion for a continuance.

In Father's motion for a continuance, Father argued that he was in the process of attempting to complete reunification services and the recommendations provided to him and asked the trial court to grant him a continuance to permit him the opportunity to complete the services. Father had ten months from the time he signed his family service plan and trial, and Father he did not demonstrate that he made a good-faith effort to comply with the Family Service Plan. *See In re O.H.*, No. 14-22-00377-CV, 2022 WL 16941732, at *7–8 (Tex. App.—Houston [14th Dist.] Nov. 15, 2022, pet. denied) (mem. op.) ("We cannot conclude that the trial court abused its discretion when it denied Mother's motion for continuance because Mother did not demonstrate that she had made a good-faith effort to comply with the FSP."). Therefore, we cannot conclude that the trial court's denial of Father's motion was unreasonable or arbitrary. *See, e.g.*, *Hamm v. Millenium Income Fund*, 178 S.W.3d 256, 270 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (holding that lack of verification or affidavit with continuance motion was sufficient basis alone for the trial court to deny the motion); *Garza v. Garza*, No. 14-22-00810-CV, 2024 WL 1102973, at *4 (Tex. App.—Houston [14th Dist.] Mar. 14, 2024, no pet.) (mem. op.) (concluding that trial court did not abuse its discretion when motion was unsworn and unsupported by affidavit); *see also In re O.H.*, No. 14-22-00377-CV, 2022 WL 16941732, at *7–8 (Tex. App.—Houston [14th Dist.] Nov. 15, 2022, pet. denied) (mem. op.) ("We cannot conclude that the trial court abused its discretion when it denied Mother's motion for continuance because Mother did not demonstrate that she had made a good-faith effort to comply with the FSP.").

To the extent Father argues the trial court erred when it denied Mother's motion for a continuance, we note that Father did not join Mother's motion for a continuance, did not advance a motion for a continuance on the same bases as

23

Mother's motion for a continuance, and did not object to the trial court's denial of Mother's motion. *See* Tex. R. App. P. 33.1(a). Thus, we conclude that this argument has been waived. *See id.*; *see, e.g.*, *In re S.N.R.-T.*, No. 14-23-00358-CV, 2023 WL 7498202, at *9 (Tex. App.—Houston [14th Dist.] Nov. 14, 2023, no pet.) (mem. op.) (concluding that Mother waived her argument when she did not join the Department's motion for a continuance, did not request a continuance herself, and did not object to the denial of the continuance requested by the Department); *see also Beutel v. Dall. Cnty. Flood Control Dist., No. 1*, 916 S.W.2d 685, 694 (Tex. App.—Waco 1996, writ denied) (concluding that offer of proof by one dfenendant did not preserve error for another defendant); *Wofle v. E. Tex. Seed Co.*, 583 S.W.2d 481, 482 (Tex. App.—Houston [1st Dist.] 1979, writ dism'd) (concluding that an objection to evidence by one defendant did not preserve error for another defendant).

We overrule Father's first issue.

## V. THE DEPARTMENT AS PMC

In her fifth issue, Mother argues the Department should not be named as J.A.R.'s permanent managing conservator.

Conservatorship determinations are subject to review for abuse of discretion and may be reversed only if the decision is arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (citing *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982)). A trial court does not abuse its discretion if there is some substantive, probative evidence to support its decision. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951); *Zeifman*, 212 S.W.3d at 587.

Mother's fifth issue is premised on her prior arguments that the trial court's predicate findings for termination were erroneous. However, we have previously

concluded that there was legally and factually sufficient evidence supporting the termination of Mother's parental rights under subsection (E) and the termination is in J.A.R.'s best interest.

We overrule Mother's fifth issue.

## VI. CONCLUSION

Having overruled all of Mother and Father's issues on appeal, we affirm the trial court's order.

/s/     Margaret "Meg" Poissant
             Justice

Panel consists of Chief Justice Christopher and Justices Spain and Poissant. (Spain, J., concurring).